**DU PONT v. DEPUTY, Collector of Internal Revenue, et al.**

**No. 4.**

District Court, D. Delaware.
March 7, 1939.

774

Robert H. Richards and Aaron Finger (of Richards, Layton & Finger), all of Wilmington, Del., and Percy W. Phillips and Laurence Graves (of Ivins, Phillips, Graves & Barker), all of Washington, D. C., for plaintiff.

James W. Morris, Asst. Atty. Gen., Frederic G. Rita and Andrew G. Sharpe, Sp. Assts. to Atty. Gen., and John J. Morris, Jr., U. S. Atty., of Wilmington, Del., for defendants.

NIELDS, District Judge.

Action for the recovery of moneys wrongfully collected by defendant[1] from plaintiff as an internal revenue tax upon gifts, with interest. This action for the refund of a tax wrongfully collected is under Section 3226 of the Revised Statutes of the United States, 26 U.S.C.A. §§ 1672–1673. The case was tried by the court without a jury.

### Pleadings

Plaintiff's declaration contains eight counts in indebitatus assumpsit. Defendant's plea of non assumpsit to each count is the sole defense relied upon.

In counts 1 and 2 plaintiff alleges violations of the United States Constitution and seeks in count 1 recovery of all amounts exacted by defendant, and in count 2 recovery of substantially all of such amounts. Counts 1, 2 and 3 will be first dealt with and will be summarily disposed of by the court. Count 4 raises the broad issue in the case and will be considered at length. Count 5 relates to policies of life insurance and is out of the case. Count 6 is admitted by stipulation of defendant to be sound. Counts 7 and 8 are general and the issues raised thereby will be considered under count 4.

■ *Count 1.* Plaintiff contends that the gift tax, as applied to him under the Revenue Act of 1932, as amended, 26 U.S.C.A. § 550 et seq., is an unapportioned direct tax prohibited by the Constitution of the United States, Article 1, Section 9, Clause 4, U.S.C.A. Plaintiff argues that making a gift is one of the available uses to which property may be put; that if taxes are levied upon every available use to which property can be put, the net effect is a property tax. Thus, if plaintiff held the stock he would be subjected to a tax on dividends. If he sold the stock he would be subjected to a tax on capital gain. If he should die he would be subjected to estate taxes. If he gives the stock away he would be subjected to a gift tax. In a word, he is taxed by reason of the ownership of the stock. The Supreme Court held the gift tax levied under the 1924 Act, 43 Stat. 313, was not a direct tax but an excise. Bromley v. McCaughn, 280 U.S. 124, 50 S.Ct. 46, 74 L.Ed. 226. The controlling authority of that case to the facts here is not affected by the provision in the 1932 Act, as amended, that the tax is a lien upon the property which is the subject of the gift and that the donee is personally liable for payment of the tax to the extent of the value of the property given.

■ *Count 2.* Plaintiff also contends that the gift tax as applied by the Commissioner to him violates the Fifth Amendment of the Constitution, U.S.C.A., since the Government's construction of the Act makes it arbitrary and capricious. The Government seeks a construction of the gift tax law, says the plaintiff, which will support a tax not measured by the value of the gift as required by Section 506, 26 U.S.C.A. § 555, but measured by the value of other stock in the portfolio of Christiana Securities Company dissimilar in characteristics and not subject to the burden of a tax on capital gain. The court ultimately passing upon this constitutional objection, however, may not adopt the Commissioner's construction of the law.

■ The unconstitutionality of the Revenue Act of 1932, as amended, as urged by plaintiff in support of counts 1 and 2 is not obvious. Under such conditions a District Court should not hold an act of Congress unconstitutional.

■ *Count 3.* Plaintiff further contends that the Revenue Act of 1932, as amended, imposes no tax upon gifts made in the year 1934 after May 10, 1934. Thus, says plaintiff, gifts made in December, 1934, could not be taxed. A brief recital will show this position of plaintiff to be unsound. Section 501(a) of the Revenue Act of 1932, 26 U.S.C.A. § 550(a), imposes a tax upon the transfer of property by gift. Section 502 of that Act, 26 U.S.C.A. § 551 note, contains a schedule of rates of

---

[1] All parties defendant will be referred to herein as "defendant".

taxation. Section 520(a) of the Revenue Act of 1934, 26 U.S.C.A. § 551, amends this schedule. Further, Section 520(b) of the Revenue Act of 1934, 26 U.S.C.A. § 551 note, provides that the amended schedule shall be applied in computing the tax for the year 1935 and succeeding years but not in computing the tax for the year 1934. Section 803 of the Revenue Act of 1934 provides "Except as otherwise provided, this Act shall take effect upon its enactment". 48 Stat. 772. It was approved May 10, 1934.

Plaintiff contends that for the period from May 10, 1934 to the end of 1934 there was no schedule of tax rates in force. It is obvious that the rates in section 502 of the Revenue Act of 1932 prevailed throughout the year 1934. Such construction is not repugnant to the amendment of the act wrought by Sections 520(a) and 520(b) and is in accord with common sense.

*Count 4.* Plaintiff alleges that the Commissioner determined the value of Christiana Securities stock on the dates of the gifts at $1,812,329 per share; and that this determination is wrong. Plaintiff alleges the true value of the stock was $9,288,000 or $1,080 per share and that such amount should be the basis for the computation of the gift tax.

### The Statute

Revenue Act of 1932 so far as material provides:

"Sec. 501.(a). For the calendar year 1932 and each calendar year thereafter a tax, computed as provided in section 502 [section 551], shall be imposed upon the transfer during such calendar year by any individual, resident, or non-resident, of property by gift." 26 U.S.C.A. § 550(a).

"Sec. 506. If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift". 26 U.S.C.A. § 555.

### Regulations

Shortly after the passage of the gift tax provisions in 1932, the Treasury Department issued regulations thereunder:—

"Art. 19. Valuation of Property.—(1) General. The statute provides that if the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. The value of property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * * *

"(3) Stocks and bonds.—* * * If the securities are not listed upon an exchange, but are dealt in actively through brokers, or have an active market, the value should be determined by taking the sale price as of the date of the gift, or, where there was no sale on that date, of the nearest date thereto upon which a sale was made, if within a reasonable period. Securities in which there are occasional transactions, but which are not dealt in actively enough to establish a fair market value, should be valued upon the basis of the nearest sale to the date of the gift, provided such sale was made in the normal course of business between a willing buyer and a willing seller, and within a reasonable period from the date of the gift. * * * Stock in a close corporation should be valued upon the basis of the company's net worth, earning and dividend-paying capacity, and all other factors having a bearing upon the value of the stock. * * *

"Where, as to any particular security, conditions of sale or ownership are such that the fair market value, determined as already indicated, would not afford a proper basis for valuation, the Commissioner, on final audit, will establish the value by considering all relevant factors. In any case where the donor contends that the value as established by the general rules already given is not the fair market value as of the date of the gift, the evidence upon which he bases his contention should be filed with the return."

In 1936 new regulations were issued with respect to the valuation of property. They provide:

"Art. 19. Valuation of Property.—(1) General. The statute provides that if the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The value of a particular kind of property is not to be determined by a forced sale price or by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time. Such value is to be determined by ascertaining as a basis the fair market value at the time of the gift of each unit of the

property. · For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the time of the gift should be considered. Depreciation or appreciation in value subsequent to the time of the gift are not relevant factors and will not be considered. * * *

"(3) Stocks and bonds.—The value at the date of the gift in the case of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on such date. * * *

"If the value of a security cannot be determined by sales, or from bid and asked prices, as prescribed in the preceding provisions of this subdivision, then, in the case of corporate or other bonds, the value is to be arrived at by giving consideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, *in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock.* * * * (Italics supplied.)

"In exceptional cases in which it is established by clear and convincing evidence that the value per bond or share of any security determined upon the basis of selling or bid and asked prices as herein provided does not reflect the fair market value thereof, other relevant facts and elements of value will be considered in determining the fair market value. The size of the gift of any security is not a relevant factor and will not be considered in such determination."

## Facts

By agreement of the parties the following facts are stipulated as true:

1. December 15, 1934, plaintiff transferred 1600 shares of the common stock of Christiana Securities Company to Wilmington Trust Company, as trustee, pursuant to the terms of an instrument of trust.

2. December 15, 1934, plaintiff transferred 1600 shares of the common stock of Christiana Securities Company to Wilmington Trust Company, as trustee, pursuant to the terms of a second instrument of trust.

3. December 22, 1934, plaintiff executed nine deeds of trust, the corpus of each trust consisting of 600 shares of the common stock of Christiana Securities Company which were thereupon delivered to Wilmington Trust Company, as trustee. The life beneficiary of each of these *trusts* was one of donor's nine children, a separate trust being created for each child.

4. March 15, 1935, plaintiff filed with Willard F. Deputy, then United States Collector of Internal Revenue for Delaware, a gift tax return for the year 1934, in which he included these gifts valuing the Christiana Securities Company stock at $1,080 per share. At the time this return was filed there was attached to it a protest. The transfers of the shares of Christiana Securities Company, referred to in paragraphs 1, 2 and 3 above, are reported in the return as Items 6(a), (b) and (c).

5. At the time this gift tax return was filed, plaintiff paid to the United States Collector of Internal Revenue for Delaware, the tax shown on the return in the amount of $3,137,164.15.

6. March 18, 1936, the Commissioner of Internal Revenue mailed to plaintiff a letter proposing a deficiency gift tax or additional gift tax for the year 1934 in the amount of $2,160,607.12.

7. March 26, 1936, the Commissioner of Internal Revenue sent to plaintiff's counsel a letter. In this letter the Commissioner · valued the 8600 shares of the common stock of Christiana Securities Company, transferred in trust as above, at $1,812.329 per share, determined as follows:

Assets:

| | |
|---|---:|
| Cash in bank | $ 1,019,483.10 |
| 3,049,800 shares duPont common at 92⅞ | 283,250,175.00 |
| 34,700 shares General Motors at 31 | 1,075,700.00 |
| 3,605 shares Wilmington Trust Co. at 182.50 | 657,912.50 |
| 7,460 shares News-Journal Co. | 846,106.26 |
| Total assets | $286,849,376.86 |
| Preferred stock 150,000 shares | 15,000,000.00 |
| Value of common stock | $271,849,376.86 |
| Value common stock per share (150,000 shares) | 1,812.329 |

In such computation, the Commissioner used the prices at which the common stocks of duPont Company and General Motors sold on the New York Stock Exchange on December 22, 1934. Plaintiff filed with the Commissioner of Internal Revenue a protest against the proposed action.

8. May 1, 1936, the Commissioner of Internal Revenue mailed to plaintiff a letter in which he notified plaintiff that he

had determined an additional gift tax for the year 1934 of $2,129,791.81.

9. In August, 1936, the Commissioner of Internal Revenue assessed the [additional] tax shown in said letter against plaintiff and transmitted the assessment list to the Collector of Internal Revenue for Delaware.

10. August 20, 1936, plaintiff, pursuant to notice and demand from the Collector of Internal Revenue for Delaware, paid to him under protest the amount of the additional tax and interest, aggregating $2,309,744.63.

11. September 24, 1936, plaintiff filed a claim for refund of gift tax for the year 1934 in the amount of $5,266,955.96 tax, and interest of $179,952.82.

12. No part of the amounts so paid by plaintiff has been refunded.

13. From September 1, 1933, to June 30, 1938, Willard F. Deputy was United States Collector of Internal Revenue for the District of Delaware. June 30, 1938, Willard F. Deputy died. Defendants are the duly appointed administratrix and administrator of the estate of Willard F. Deputy, deceased.

14. Without prejudice to the demands set out in other counts of the declaration, the parties agree that the net taxable gifts, as determined by the Commissioner of Internal Revenue in Exhibit H, should be reduced by $20,000 under Count 6 of the declaration. The foregoing relates only to such adjustments as result from increased exclusions under Section 504(b) of the Revenue Act of 1932, 26 U.S.C.A. § 553 (b).

From the evidence it appears:

A. In December, 1934, Christiana Securities Company had outstanding 150,000 shares of common stock of the par value of $100 per share and 150,000 shares of 7 per cent preferred stock of the par value of $100 per share. December 10, 1934, there were 126 common stockholders of record. During the year 1934 there were sales of 1413 shares of the common stock of Christiana Securities Company at prices ranging from $1225 to $1509 per share. The last sale prior to December 15, 1934, and December 22, 1934, was a sale on December 6, 1934, of ten shares at $1495 a share. The largest sale was of 200 shares and there were two sales of 100 shares each. Most of the sales were of ten shares or less. There were approximately 100 sales in 1934, the average sale being about fourteen shares.

B. The net earnings of Christiana Securities Company per share of common stock and the dividends received per share of common stock for the years 1928 to 1934, inclusive, were:

| Year | Earnings | Dividends |
|---|---|---|
| 1928 | $ 99.96 | $ 88.00 |
| 1929 | 122.56 | 107.00 |
| 1930 | 79.87 | 56.00 |
| 1931 | 75.29 | 76.50 |
| 1932 | 49.94 | 50.00 |
| 1933 | 49.66 | 50.00 |
| 1934 | 56.94 | 57.00 |
| | $ 76.32 | $ 69.21 |

C. During the years 1928 to 1934, inclusive, Du Pont Company owned a substantial block of the common stock of General Motors Corporation.

D. If the earnings or losses of the companies whose stocks were owned, directly or indirectly, by Christiana be treated as income of Christiana to the extent of the interest of Christiana in such earnings, whether or not such earnings were distributed, the earnings per share of Christiana common stock were:

| | |
|---|---|
| 1928 | $175.71 |
| 1929 | 171.32 |
| 1930 | 80.31 |
| 1931 | 61.89 |
| 1932 | 2.94 |
| 1933 | 64.02 |
| 1934 | 78.75 |
| Average | $ 90.71 |

The court also finds that:

I. The common stock of Christiana Securities Company which was the subject of the gifts by plaintiff in December, 1934, had been acquired by plaintiff in 1915 at a cost of less than $50 per share. Before the gift, plaintiff owned 19,869 shares of the common stock of Christiana Securities Company being 13% of the total outstanding stock.

II. There was no market for the common stock of Christiana Securities Company in December, 1934, in which 8600 shares, or 1600 shares, or 9 blocks of 600 shares each, of such stock could have been sold at the prices at which small quantities were sold in 1934.

III. The stock given by the plaintiff to the trustee was and is subject to an obligation or lien to pay income taxes if

and when the stock is sold, upon the difference between the selling price and the cost to the donor.

IV. "Control" or domination of Christiana Securities Company, or of duPont Company, or of General Motors Corporation, did not attach to the 8600 shares of Christiana Securities Company stock, the gifts in this case, nor pass to the trustee or donees thereof.

V. The value of the gifts of 8600 shares of the common stock of Christiana Securities Company made by the plaintiff on December, 15, 1934 and December 22, 1934, was $1100 per share or an aggregate value of $9,460,000.

### Market Valuation

Christiana Securities Company was a holding company organized in 1915. It had outstanding 150,000 shares of common stock. It is what is generally known as a "close corporation". Its principal asset was the common stock of E.I. duPont de Nemours & Company. It also owned a large block of the common stock of General Motors Corporation. Actual sales or quotations on the New York Stock Exchange have been considered as the best evidence of fair market value, provided, of course, they refer to representative sales. The stock of Christiana Securities Company was not listed on the New York Stock Exchange or any other stock exchange. If a security is not listed on a recognized exchange, evidence of market value may be found in current price lists and market reports, including financial journals. There is no such evidence in this case. There is no evidence of "bid" and "asked" quotations during the year 1934.

There is evidence of sales by the two principal brokerage houses in Wilmington—Laird, Bissell and Meeds, and Laird and Company. Each of these houses had sales offices in New York and Philadelphia. They sold less than 1500 shares during the period from May 14, 1934 to December 31, 1934. Of these only 166 shares were sold in the month of December, 1934. Sales were largely in lots of from 1 to 10 shares. These sales fall far short of furnishing satisfactory evidence of an open market. It is important to consider their nature.

Jones testified that from 1920 to 1932 he was connected with Laird, Bissell and Meeds and thereafter with Laird and Company in the sales end of their business. During the period from May to December,

1934, he solicited approximately 125 general managers, assistant general managers and junior executives of the duPont Company. He was able to sell Christiana Securities Company stock to only about 25%. All sales were in lots of from one to twenty five shares. After exhausting his duPont list he solicited other possible purchasers with no success.

Backus, a member of the firm of Laird, Bissell and Meeds, testified that during the period from July, 1934, to December 7, 1934, his firm sold approximately 600 shares of Christiana Securities stock. When stock was offered to his firm they usually had a meeting of the partners and the stock was divided among the partners for purposes of sale. Being a new unlisted security it was found very difficult to sell. The partners solicited prospects residing not only in Wilmington but in New York, Detroit and Chicago. They also contacted insurance companies and investment trusts with poor results. Both Jones and Backus testified that from their experience in selling Christiana Securities stock in 1934 it would have been impossible to sell a block of 8600 shares or any substantial part thereof except at sacrifice prices.

The testimony of Jones and Backus is fully corroborated by White, a member of one of the largest banking houses in the country (whose testimony is more fully referred to hereafter). He testified as to his own unsuccessful efforts to sell a block of 300 shares of Christiana Securities stock.

The evidence with respect to sales of Christiana Securities Company stock in 1934 does not afford proof of the fair value of that stock or the existence of an "open market" for it in 1934. This, however, is not an insuperable obstacle to determining a proper valuation of this stock at the time of the gifts.

### True Basis of Valuation

*David Friday.* After graduating at the University of Michigan in 1908 Dr. Friday continued as a teacher of economics, accounting and finance. In 1917 he was head of the Department of Economics of the Graduate School of New York University. In 1918 he aided the Post Office Department in fixing the awards of just compensation to the telegraph and telephone companies during Federal control. In 1919 he returned to the University of Michigan as professor of economics specializing in

money and credit. In 1923 he became a lecturer in Brookings Graduate School of Economics and Research in Washington. Recently he has devoted himself to consulting work in economics and valuations. He has acted as a valuation expert for the Post Office Department, Michigan Railroad Commission, Attorney General of Michigan and United States Treasury Department. He has represented bondholders and stockholders in valuing their holdings. In 1926 he acted as an expert in the tax case of Senator Couzens involving the valuation of the stock of Ford Motor Company. In 1925 he was retained by the Automobile Manufacturers Association. He testified for the Government in valuing stock. He is a member of a number of economics societies and has written extensively on economic subjects.

Dr. Friday testified that in preparation for this trial he had studied income accounts, balance sheets and annual reports of the duPont Company from 1928 to 1935. Before trial he had studied them for the Laird Estate case. Also he had studied the annual reports and history of General Motors and the fluctuation of automobile profits. He had acquainted himself with sales on the New York Stock Exchange and with the list of private sales of stock of Christiana Securities Company. Generally he had done the necessary work upon which to base an opinion of the value of Christiana Securities Company stock. In valuing Christiana stock Dr. Friday sought to learn Christiana's share of the earnings of the corporations whose stock it owned either directly or indirectly. Its principal asset was the stock of duPont Company. That company owned a large block of General Motors stock.

On the assumption that General Motors distributed all the profits on the stock so held to duPont Company and duPont Company distributed all its earnings including the earnings received from General Motors to Christiana Securities Company and that the other companies whose stock was held by Christiana also distributed all their earnings, what would be the earnings of Christiana? In short, what was Christiana's slice of the earnings of the underlying companies? To answer the above question, Dr. Friday prepared from the documents in evidence a statement of the net income and dividends of Christiana Securities Company from 1928 to 1934 inclusive. This statement shows the earnings per share of Christiana based upon the actual receipts by Christiana of dividends paid by the underlying companies; the earnings of Christiana on a consolidated basis which includes Christiana's share of the earnings of the underlying companies whether distributed or not; and the dividends paid by Christiana.

| Year | Net Earnings Per Share-Actual Receipts. | Equity in Undistributed Earnings Stocks Owned. | Earnings, Including Equity in Undistributed Earnings. | Dividends Paid |
|------|------|------|------|------|
| 1928 | 99.96 | 75.75 | 175.71 | 88.00 |
| 1929 | 122.56 | 48.76 | 171.32 | 107.00 |
| 1930 | 79.87 | .44 | 80.31 | 56.00 |
| 1931 | 75.29 | (13.40)* | 61.89 | 76.50 |
| 1932 | 49.94 | (47.00)* | 2.94 | 50.00 |
| 1933 | 49.66 | 14.36 | 64.02 | 50.00 |
| 1934 | 56.94 | 21.81 | 78.75 | 57.00 |
| Average | 76.32 | 14.39 | 90.71 | 69.21 |

*Loss

It appears from the above statement that the average earnings of Christiana Securities Company for the years 1928 to 1934 inclusive were $76.32 per share; that the average earnings of the underlying companies not distributed were $14.39 per share; that the average earnings of the underlying companies, per share of Christiana stock, were $90.71; and that the average dividends paid were $69.21 per share.

Dr. Friday determined that the value of 8600 shares of Christiana Securities stock could not be determined by the prices brought by the sales of a few shares; that such value could only be determined by an examination into the economic factors which determine value and which would be disclosed by an analysis of the stocks held by Christiana. He was of opinion that the valuation should be based upon Christiana's interest in the earnings of the underlying companies. Those earnings averaged $90.71 per share. He explained that it was sound practice to value corporate stocks at not more than 10 times their average earnings. Here, however, Dr. Friday used a factor of 12 times the earnings of the underlying companies, or a capitalization rate of 8⅓% which resulted in a higher valuation. Further, notwithstanding the highly competitive nature of the automobile industry and of the chemical business, he used 12 times earnings instead of 10 times earnings. Multiplying the average earnings of the

underlying companies of $90.71 by 12 he arrived at a value of $1088.52 for each share of Christiana. The same principle is expressed as a certain number of years purchase. Thus 12 years purchase indicates that the profits for 12 years would return the price paid.

Dr. Friday also determined the value of Christiana stock by another accepted method. He examined the balance sheets of General Motors and duPont Company and determined that the tangible assets of these companies as shown by their statements amounted to $674.19 per share of Christiana Securities common stock. In other words, the tangible assets back of Christiana were less than $700 per share. Any other value of Christiana stock would be represented by good will, patents, formulae, or excess earning power. 6% of the tangible assets yielded · $40.45. Deducting that amount from the earnings of $90.71 he found the average excess earnings of $50.26 to be earnings attributable to intangibles. Capitalizing $50.26 at 12% he found the value of intangibles to be $418.83. Adding the value of the tangibles and intangibles he arrived at a value of $1093.02 for a share of Christiana Securities Company. This method of determining value is a form of valuation which has been recognized and used by the courts for many years. It is founded on the principle that a business man will expect a return of at least 6% on money invested in tangible assets. Generally the courts have not used more than five years purchase in determining the value of intangibles or good will. Very often they have used three years purchase. Dr. Friday stated that the rates used by him in this case produced a higher value for the stock than if he had used the rates of capitalization of earnings used by him in other cases when testifying for the Government. Further, Dr. Friday testified that he had been a director of various investment trusts. It was there necessary to consider whether the price at which the securities were selling were sound prices for investment. Long experience with investment problems had shown that 12 times earnings is a proper measure of value of common stock in substantial industries with good prospects.

Dr. Friday testified that considering the different methods of valuation described by him he was of opinion that the value of the common stock of Christiana Securities Company did not exceed $1100 per share.

*Robert V. White.* Having finished the undergraduate and law courses at Harvard College, White entered the law office of Cravath & Henderson in 1912. He was employed in passing on issues of bonds and stocks for clients including Kuhn, Loeb & Company, J. and W. Seligman & Co., Redmond & Company, Speyer & Company, and Blair & Company. He remained with the law firm for six years. He also passed on issues of bonds of Pennsylvania Railroad Co., Central of Georgia Railway Co., St. Louis-San Francisco Railway Co., and many other railroad issues; General Motors Corporation, Columbia Gas & Electric Corporation, Cincinnati Gas and Electric Co., Prest-O-Lite Company, Inc., Willys-Overland Company, and other industrial companies. In 1920 he became a partner in J. and W. Seligman & Co. That firm conducted a banking and investment business and were members of the New York Stock Exchange. They bought large issues of bonds and stocks and resold them. He remained a partner for fifteen years and passed upon Bethlehem Steel Corporation bonds and stocks, General Motors securities, Columbia Gas & Electric Corporation, St. Louis-San Francisco Railway Co., Missouri-Kansas-Texas Railroad Co., Augusta Railroad, Cincinnati Gas & Electric Co., Minneapolis-Honeywell Regulator Company, Briggs & Stratton Corporation, Victor Talking Machine Company, Bristol-Myers Company, and many others.

In 1935 White became a member of the brokerage firm of Dyer, Hudson and Company and later of Jackson and Curtis. He engaged in the purchase and sale of securities and acted as a broker. In September, 1938, he became president of Lehigh Coal and Navigation Company. He was a director in several investment trusts, Tri-Continental Corporation, Selected Industries, Inc., Capital Administration Company, Ltd., and Broad Street Investing Company, Inc. From May, 1935, until September, 1938, he was a member of the Board of Governors of the New York Stock Exchange.

In preparing for this case, White studied the balance sheets and income statements of Christiana Securities Company and of the companies whose stock it held. He also studied the annual statements of General Motors and duPont Company for 1928 to 1934, inclusive. As a witness in the Laird Estate case he had considered the value of the common stock

of Christiana Securities Company as of November, 1927.

White was familiar with the stock of Christiana Securities Company. From February, 1935, to September, 1937, his brokerage firm had an office in the city of Wilmington. White was frequently there. He attempted to sell 300 shares of Christiana stock in 50 share lots at a price equal to 72% of the price of duPont but was unsuccessful. From the knowledge thus gained he testified that there was no market broad enough for 8600 shares of Christiana stock in 1934 or for any reasonable period thereafter except at sacrifice prices.

White testified that Christiana Securities stock could not have been sold to a syndicate of bankers or brokers. White had formed many syndicates selling securities all over the United States and in foreign countries. From his experience, he knew that investment bankers would only syndicate stock for which a market existed. 8600 shares were not enough to create a market. Christiana stock was little known outside a very restricted area. Moreover, the investing public will not buy stock selling at $500 or $1000 per share. White further testified that sometimes a capitalist or corporation could be found to purchase a large block of stock conferring control. No such situation existed here. Acquiring these 8600 shares could not accomplish any such purpose.

Here it was necessary to consider the price a long term investor would be willing to pay for the stock. This involved consideration of the industries from which Christiana derived its income. You must look at their record of earnings over several years, their position in the industry and the character of the management.

Christiana Securities Company did not manage any properties. Its earnings came from other companies. Securities are valued for what they produce. It was therefore necessary to consider the earnings of the underlying companies. White found duPont and General Motors passed the test as to management, business and earnings except the earnings were subject to inflation and deflation cycles. White testified that in his experience investors believed investment values should be between 5 and 10 times earnings and that the long term investor is seldom willing to pay more than 10 times earnings for common stock. However, Christiana was one

degree removed from the earnings of duPont and two degrees from the earnings of General Motors. Under these circumstances White testified that 10 times earnings was the proper basis for valuation. By earnings he stated he did not mean the earnings received by Christiana by way of dividends but the earnings of the underlying companies which were attributable to Christiana holdings. They were:

| | |
|---|---|
| 1928 | $175.71 |
| 1929 | 171.32 |
| 1930 | 80.51 |
| 1931 | 61.89 |
| 1932 | 2.94 |
| 1933 | 64.02 |
| 1934 | 78.75 |

White took a period of seven years up to 1934, including the high earnings of 1928 and 1929 and the low earnings of 1931 and 1932. The average earnings per share for this period was $90.71. Applying the factor of 10 times earnings to this average gives a value of $907.10 as the fair market value of one share of Christiana common stock in December, 1934. Multiplying the unit value of $907.10 by 8600 shares gives a total value of $7,801,060. White testified that a sale of 8600 shares of Christiana at $907.10 per share in December, 1934 was a fair price but it would be unreasonable to expect so high a price if the whole block was to be sold at one time.

White had been the director of four or five important investment trusts. He found that investors want well known securities which can be readily sold. He testified it would have been impossible to organize an investment trust with Christiana Securities Company common stock as the principal or sole security.

*The Commissioner.* In answer to plaintiff's proof of valuation defendant relies upon the "presumption of correctness" attaching to the Commissioner's determination. In valuing the 8600 shares of Christiana Securities stock the Commissioner examined the report of sales on the New York Stock Exchange in December, 1934 and found duPont sold at $92 7/8 per share and General Motors at $31 per share. He multiplied the number of duPont and General Motors shares held by Christiana Securities by these prices. He found duPont would be worth $283,250,175 and General Motors $1,075,700 and based his assessment of $1812.329 per share of Christiana thereon. In making such a valuation the Commissioner assumed that 3,049,800 shares of the common stock of

duPont Company could have been sold in December 1934 at the same price at which a few hundred shares were then sold on the New York Stock Exchange. Adopting such a basis of valuation for Christiana Securities stock was obviously unsound. It is certain that the owner of 8600 shares of Christiana Securities stock could not put his hands into the portfolio of Christiana and take therefrom his share of duPont and General Motors stock; nor could he force the sale of such stock. Basing a valuation upon sales that could not be made is futile. The Commissioner's determination that the shares of Christiana Securities common stock were of the value of $1812.329 a share is erroneous.

To sustain the Commissioner's determination of $1812.329 defendant called two witnesses.

*Benjamin Graham.* After graduating from Columbia College in 1914 Graham was employed by Newberger, Henderson & Loeb and in 1919 was admitted as a general partner. In 1923 he severed his connection with that firm to manage private investment funds and to act as investment counsel. Since 1927 he has been a lecturer on finance at Columbia and has given a course in security analysis. He is coauthor of two text books on finance, the larger called "Security Analysis" and the smaller "Interpretation of Financial Statements". During the last two years he has been employed as a witness, both by the Government and by others, in litigation involving the fair market value of blocks of stock.

He testified that in connection with his business activities, both with the stock exchange house and since, he had occasion to buy and sell large as well as small blocks of securities and particularly large blocks of securities in which the control element was involved. On several occasions he had acquired control of corporations by making bids for stock subject to obtaining sufficient to constitute control. He has been a director of Northern Pipe Line Company, Colonial States Fire Insurance Co., Unexcelled Manufacturing Company, United States Cigar Stores Company of America, Royal Weaving Company and Mohawk Mining Company. He has also been a member of protective committees of corporations in reorganization.

Graham testified that the two blocks of 1600 shares and the 9 blocks of 600 shares of Christiana were worth in De-

cember, 1934, $1811 per share. In arriving at this valuation Graham calculated the value of Christiana Securities common stock in the terms of the current market price on the New York Stock Exchange of duPont and General Motors stock. He added to this total the market value of the other stocks held by Christiana. This process produced the asset value of $1,811 per share for the common stock of Christiana. This is the identical method adopted by the Commissioner. It is equally unsound.

Graham also attempted to sustain his valuation of Christiana Securities stock on the ground that these 8600 shares possessed some peculiar value because of control. No element of control attached to the 8600 shares. No person or group would have lost control by a sale of this stock. No person or group would have gained control by the purchase of this stock. Graham also attempted to justify his valuation on the ground that the stock was owned within a "control group" which could have taken out the underlying securities had they seen fit to do so. Neither the underlying securities nor the proceeds from the sale thereof could have passed to the stockholders of Christiana without the payment of a tax of at least 50% of the proceeds. The record shows that earnings of $45,000,000 were declared as stock dividends in 1922 and that Christiana had other undistributed earnings of $18,452,723.78 or a total of $63,452,723.78. All accumulated and reinvested earnings would be subject to tax at both normal and surtax rates if the company was liquidated in 1938 under section 112(b) (7) of the Revenue Act of 1938, 26 U.S.C.A. § 112 (b) (7). The tax on dissolution would be approximately $40,000,000. Although two-thirds of the stockholders of Christiana could have effected a dissolution, it does not follow that the holders of 8600 shares could have done this or that the plaintiff could have done it or that the necessary number of stockholders would have consented to it. In determining the valuation of the 8600 shares of Christiana Securities stock the element of control of Christiana, of duPont or of General Motors is not a legitimate factor. Yet we find Graham in fixing value always including control. He testified:

"XQ. And you have arrived at the conclusion of $1811 per share? A. I have arrived at the conclusion that a willing buyer, who is considered as willing

to purchase these blocks of stock from the owner and placing himself in the same position with respect to control as the owner, would be willing to pay that price."

"XQ. Have you expressed the opinion that this could have been sold to anyone outside of the control group at $1811 a share? A. No, I have not expressed such an opinion."

The valuations of $1088.52 and $1100 for each share of Christiana stock on the part of Dr. Friday and of $907.10 on the part of White were corroborated by Graham on cross-examination. He was asked to value the stock of a corporation like duPont except (a) it had no General Motors stock, and (b) there was no readily available market. The earnings and dividends of such hypothetical corporation were assumed to be those of Christiana Securities Company after eliminating General Motor's earnings and dividends. From the evidence it appears that the earnings and dividends of one share of General Motors stock could have been purchased for $588.93 by buying 18.9928 shares of General Motors stock at $31 per share (the current price on the stock exchange in December 1934). By purchasing stock of General Motors the purchaser would acquire directly a large part of the income and dividends he would receive indirectly if he bought Christiana.

Graham was asked to value the earnings of Christiana with the earnings of General Motors entirely eliminated therefrom. He answered that the value of a share of stock based on such earnings was between $350 and $500 per share. The earnings and dividends of General Motors which had been eliminated could have been bought for $588.93 thus making Graham's valuation of the stock of Christiana Securities Company lie between $938.93 and $1088.93 per share. This valuation compares with $907.10 by White and $1100 by Friday.

*Samuel T. Naumberg.* After graduating from Williams College in 1911 he entered the employ of Henry L. Doherty & Company. He started as a salesman and became Assistant Manager of the securities department. In 1929 he became associated with Lehman Brothers.

He expressed the opinion that a syndicate could have been organized to have purchased 8600 shares of Christiana Securities stock at $1405 per share and that such stock so purchased could have been sold to the public at $1480 per share. He made no attempt, however, to analyze the earnings or dividend record of Christiana Securities Company as a basis for valuing Christiana stock. Further he knew of only one instance in which a syndicate offering had been made of a block of stock as small as 8600 shares. The stock about which the witness testified had been listed on the New York Stock Exchange before purchase by the syndicate and had over 6000 share holders. Obviously such a stock had a wide distribution and an established market. Christiana stock was not comparable.

### Law

The issues of law raised by counts 1, 2 and 3 have been sufficiently dealt with in the earlier part of this opinion.

■ In determining the value of the gifts consideration must be given to all factors which affect value. One of those factors is the size of the block involved and the market for such a block. Section 506 of the Revenue Act of 1932 provides: "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

Shortly after the passage of the gift tax provisions in 1932 the Treasury Department issued regulations thereunder. Those regulations provided that in determining valuation the fair market value was to be used and where there is a market for the particular securities the market price was to be followed. The court has found that there was no market for 8600 shares of Christiana Securities common stock at the time of the gift, nor was there a market for 1600 shares, or nine blocks of 600 shares each, of such stock.

The defendant relies upon an amendment to the gift tax regulations in 1936 which provides: "The size of the gift of any security is not a relevant factor and will not be considered in such determination."

By this regulation the Commissioner substituted an arbitrary rule for the statutory provision that the value of the property should govern. Litigation resulted. The courts have been unanimous in declaring that the determination of value is not to be restricted by such arbitrary rule and that all relevant factors must be considered. The size of the block of securities is a relevant factor. In Helvering v. Safe Deposit & Trust Co. of Balti-

more, 95 F.2d 806, 810, the Circuit Court of Appeals for the Fourth Circuit in affirming the decision of the Board of Tax Appeals said: "In short, the Board accepted the testimony offered on behalf of the estate with regard to the depressing effect upon prices that occurs when a market is sought for a large block of stock, and declined to be bound by the restrictions of the regulation. As a general rule, a regulation of an executive department, passed under statutory authority, is valid; but a regulation which 'operates to create a rule out of harmony with the statute, is a mere nullity. * * *' "

The method adopted by the Commissioner in determining the value of Christiana Securities common stock has been specifically rejected by the Circuit Court of Appeals for the Third Circuit in Laird v. Commissioner of Internal Revenue, 85 F.2d 598.

The adoption of the rule of 12 times average earnings of the underlying companies for a series of years, or a capitalization rate of 8⅓%, furnishes the fairest method of determining the value of Christiana Securities Company common stock. The Supreme Court of the United States in determining the value of shares of stock adopted and approved the capitalization of average earnings over a period of years at the rate of 6%. Virginia v. West Virginia, 238 U.S. 202, 35 S.Ct. 795, 59 L.Ed. 1272.

Plaintiff is entitled to a judgment against the defendant based upon a valuation of $1100 per share for the common stock of Christiana Securities Company and an adjustment of the subject matter of count 6. If the parties cannot agree on the amount of such judgment further proceedings may be had.

Exceptions, if any, may be filed within ten days.