GROFF v. SMITH, Collector of Internal Revenue.

No. 45.

District Court, D. Connecticut.

July 12, 1940.

Ralph E. Brush, of Greenwich, Conn., and Leland T. Atherton, of New York City (Chadbourne, Hunt, Jaeckel & Brown, of New York City, of counsel), for plaintiff.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe and Carl J. Marold, Sp. Assts. to Atty. Gen., Francis T. Donahoe, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., and Robert P. Butler, U. S. Atty., of Hartford, Conn., for defendant.

### Finding of Facts

HINCKS, District Judge.

A. All the facts of this case are stated in an extensive stipulation which may be deemed a part hereof. I think, however, the following resume will suffice for an understanding of the rulings which I shall presently indicate:

B. 1. The plaintiff on November 11, 1936, gave 14,000 shares of Electrolux Corporation to his wife, and paid a gift tax thereon based on a valuation of $23.375 per share, which was the average mean selling price on the Montreal Exchange for November 10 and November 12 (November 11 being a holiday). Thereafter the plaintiff duly filed a claim for refund based upon a contention that these shares should have been valued at only $17.25 per share. This claim was rejected.

2. During 1936, Electrolux had outstanding 1,237,500 shares which were listed on the Montreal stock exchange and 250,000 shares listed on the London Exchange.

3. From 1931 to 1936 there had been a substantial and continuous growth of the household electrical appliance industry (Electrolux makes vacuum cleaners) and the financial history of Electrolux shows that it participated in this growth.

4. On the Montreal Exchange the course of the recorded sales prices of Electrolux stock was as follows: 28 in February, 1936, dropping to 24 by the end of March; then a very gradual recession to about 21 in October, 1936; then a gradual rise to 24 on November 10, followed by a slight dip to 22½ on November 25, which continued (with fractional variations) to December 2; then a slight rise which reached 25 on December 17; and thereafter the price seems not to have fallen below 23 until January 25, 1937, nor below 22 until January 30, 1937.

5. On the Montreal Exchange the monthly volume of sales in January and February, 1936, averaged 23,000; from March to September inclusive, 2,700; for October, November and December, 5,600; for January and February, 1937, 4,500; and for March and April, 1937, 4,400; and the actual sales on November 10th were 145, on November 12th 250 (November 11 was a holiday); the actual sales for the week before the gift were 2,895, for the week after, 1,400.

6. Trading on the London Exchange was at prices corresponding to Montreal, but the record contains no evidence of the volume of trading elsewhere than in Montreal.

7. I find as a fact from the testimony of plaintiff's expert that 14,000 shares could not have been sold on the Montreal Exchange during the week of November 11th to November 18th to net over $17.25 per share in the aggregate.

Comment. To be sure, my finding rests only upon the opinion of an expert. If on

cross-examination it had developed that the expert's opinion was not based on actual experience or knowledge of the effect of offering comparable blocks of securities under comparable circumstances, it well might be that I should have felt it unsafe to rely upon his opinion. But in view of the fact that the Government waived cross-examination, I think I may properly adopt the opinion of one having the qualifications of this witness.

8. Taking into account all the evidence, I find that plaintiff has failed to prove that the fair market value of Electrolux stock on November 12, 1936, was less than $23.375.

Comment. The plaintiff's proof is insufficient in that it is confined to the probable results of a liquidation accomplished within one week of the date of gift; also in that it is confined to the probable results of a liquidation accomplished on the Montreal Exchange. When the stock was listed in London and also sold over the counter, I cannot assume, in the absence of explanatory and supporting evidence, that a skillful broker would have neglected these additional channels of liquidation or that if free from pressure he would have considered it advisable to complete the liquidation in one week.

### Opinion

■ By the relevant statute, Revenue Act of 1932, Section 506, 26 U.S.C.A. Int. Rev.Code, § 1005, it is provided that where "the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." And as is plainly recognized by Treasury Regulations 79 (1936 Ed.) Art. 19, as amended by T. D. 4901, 1939–1 Cum.Bull. 341, by "value" the statute means the fair market value or "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. The value of a particular kind of property is not to be determined by a forced sale price."

But the concept of value must be distinguished from the concept of liquidity. Value depends upon the existence of willing buyers. Liquidity depends upon the accessibility of willing buyers. Given property may have a stated market value on a certain day and yet its true market value may not be realizable on that day, Whitlow v. Commissioner, 8 Cir., 82 F.2d 569; the market value is there if there then exists a willing seller and a willing buyer at that price, yet the value may not be realizable on that very day because the normal commercial practices which bring together willing sellers and buyers have not had a reasonable time to function—in other words, the potential buyers are not immediately accessible.

■ Thus, to say that 14,000 shares of Electrolux had a fair market value of $23.375 on November 11, 1936, does not necessarily mean that 14,000 shares could have been liquidated on that day, or within one week, at that price. Chicago Ry. Equipment Co. v. Blair, 7 Cir., 20 F.2d 10. I hold rather that 14,000 shares must be deemed to have had a market value, within the meaning of the statute, of $23.375 on November 11, 1936, if through all available commercial channels they could have been disposed of so as to yield an aggregate equivalent to $23.375 per share within such a period of time as a broker, reasonably skilled in dealing with such securities, would have taken if free from pressure by his client to accomplish an advantageous liquidation in view of the situation then existing. Cf. Helvering v. Safe Deposit Co., 4 Cir., 95 F.2d 806.

■ Thus in my view it would have been competent to offer expert testimony as to the time which would thus have been required for advantageous liquidation and the results of a liquidation which could have been accomplished within that time. And such evidence, if convincing to the court, might properly have been found to satisfy the burden of proof which rested on the plaintiff. Jenkins v. Smith, D. C., 21 F.Supp. 251. But in the absence of evidence covering this ground, there is nothing to overcome the weight, slight though it may be, of sales prices for small lots at the date of gift. Rogers v. Helvering, 2 Cir., 107 F.2d 394. In such cases, the result will be that the burden of proof on the plaintiff has not been sustained. Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991; Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385; United States v. Anderson, 269 U.S. 422, 423, 46 S.Ct. 131, 70 L.Ed. 347. Cf. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623.

■ The Government objects that sales prices are the best evidence of market value. With this generality I agree. But I don't agree that the sales price of one acre of land or of 200 shares of stock is

necessarily the best evidence of market value of a thousand acre tract or of a block of 14,000 shares. Hazeltine Corp. v. Commissioner, 3 Cir., 89 F.2d 513. The existence of a market for the smaller item is at most slight evidence of the contemporaneous existence of a larger market. One must consider the capacity of the market to absorb the large offering if there is competent evidence on that factor. A substantial disparity between the volume of sales upon which the Commissioner's finding is based and the size of the block to be valued, opens the door to competent evidence that the entire block could not have been sold at the sales prices obtaining at the critical date. Cf. DuPont v. Deputy, D.C., 26 F.Supp. 773.

■ The Government objects that thus to take into account the capacity of the market tends to establish a double standard of value; that the man who buys piecemeal will be taxed at a higher rate than the man who buys in volume. But after all, to the slight extent that the rule which I adopt has this effect it is thoroughly consistent with contemporary commercial life. We all know that lower unit prices are available to the jobber and wholesaler who buy in bulk than to the consumer who buys loaf by loaf.

Further objections of the Government can more conveniently receive comment in connection with specific rulings to be noted below.

■ When the rule which I adopt is applied to the facts of the case, it appears that there is no evidence here as to the time which would have been required for the advantageous liquidation of a block of 14,000 shares released for sale on November 11, 1936; nor is there evidence to show what the result of such a liquidation would have been if accomplished with reasonable skill, utilizing all available commercial channels. It follows, therefore, that the plaintiff cannot recover.

## Conclusions of Law

1. Plaintiff's objection to the testimony of defendant's expert as contained in Paragraph 28 of the stipulation is sustained.

■ Comment. This testimony was expressly predicated upon the assumption of "an increase in the investment market of 14,000 shares in the supply for sale and an increase of 14,000 shares in the demand." But one of the principal issues of the case is whether there was in fact a sufficient demand in the market to absorb 14,000 additional shares. The record is wholly silent on that point. While the facts found show the existence of a limited market, there is no affirmative proof that the market was capable of absorbing 14,000 shares at $23.375. There is thus no factual basis for the assumption; and hence for the opinion, of defendant's expert.

2. The Government's objections to so much of paragraphs 13 and 14 as relate to prices and volume of sales of Electrolux subsequent to November 11, 1936, are overruled.

Comment. The Government objects to evidence of sales prices and volume of sales subsequent to the critical date, citing Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 292, 73 L.Ed. 647.

■ I quite agree that such evidence is admissible only if foundation therefor is laid by evidence that the block could not be liquidated on the critical date without depressing the market. On the whole, I think this necessary foundation for the evidence is present here.

If the foundation for the evidence is thus laid, its admissibility is distinguishable from that of the evidence excluded in the Ithaca case. For in the Ithaca case, the ultimate question was as to the value, as of the date of decedent's death, of a remainder interest which as a matter of law was dependent upon the duration of a life estate. Clearly a prospective purchaser on the critical date in formulating an offer for the remainder interest would have viewed the expectancy of life of the life tenant as a factor of first importance in that it determined the quantum of the legal interest to be evaluated. Doubtless it was this thought that Mr. Justice Holmes had in mind when he said: "Therefore the value of the thing to be taxed must be estimated as of the time when the act is done. But the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market."

■ Here, however, the volume and prices of sales occurring after the critical date are admissible, Helvering v. Safe Deposit Co., supra, not as factors determining what a potential buyer would pay, but rather for the light which they shed on the volume and level of the market during the

relevant period. They are evidential of the "relative intensity of the social desire for" Electrolux stock at the time thereof. And presumably, in the absence of evidence to the contrary, the existence of a social desire in the subsequent period is indicative of its existence at an earlier time, the presumption weakening with the passage of time. Wigmore, Sections 437 and 463.

3. The Government's objections to paragraphs 18, 19, 20, 21 and 22 of the stipulation are sustained.

 Comment. By these paragraphs of the stipulation the plaintiff offers the Electrolux profit and loss statements, dividend records and balance sheets, etc., from 1931 through 1938. The Government objects to the statements subsequent to 1936. As compared with the evidence of the prices and volume of sales in this period, which has been admitted, the bearing of 1937 and 1938 profit and loss statements on the ultimate issue is too indirect to be of assistance to the court. Thus exclusion of the statements objected to is within the discretionary power of the trial court.

Also, I incline to the view that the objection might be sustained as violating the rule of the Ithaca case. For such statements, if relevant at all, go to show the factors entering into the intrinsic value of the stock as distinguished from its market value, and necessarily prospective purchasers on November 12, 1936, would not have been influenced by factors of intrinsic value as they existed at a later period.

4. The Government's objection to the testimony of plaintiff's expert, as contained in paragraph 27 of the stipulation, is overruled.

Comment. This evidence is admissible even though insufficient of itself, for the reasons stated under paragraph 8 of the findings, to sustain the plaintiff's case. Jenkins v. Smith, D. C., 21 F.Supp. 251. For it carries the plaintiff part way toward his goal, in that it tends to indicate limitations on the capacity of the Montreal market. And the plaintiff was not required to prove his whole case by one witness; he was entitled to proceed step by step.

5. The burden was upon the plaintiff to prove that the fair market value as of the date of gift was less than the amount assessed; also the amount of the overassessment.

Comment. The ultimate burden of proof, of course, is not satisfied by mere proof that the entire block could not have been sold on the date of gift without depressing the market. For as my opinion points out, even in such case the sales prices at the date of gift may still represent the fair market value.

6. The defendant is entitled to judgment, with costs.