**HELVERING, Commissioner of Internal Revenue, v. MAYTAG.**

**SAME v. MAYTAG et al.**
Nos. 12025, 12026.

Circuit Court of Appeals, Eighth Circuit.
Jan. 20, 1942.

Harry Marselli, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. L. Monarch, Sp. Asst. to Atty. Gen., on the brief), for petitioner.

R. L. Read, of Des Moines, Iowa (J. G. Gamble and Gamble, Read, Howland & Rosenfield, all of Des Moines, Iowa, on the brief), for respondents.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

### Statement.

These two proceedings, which were consolidated before the Board and there disposed of by joint findings of fact and opinion, and which have been consolidated in this Court, involve two separate liabilities, one for an estate tax asserted against the estate of Dena B. Maytag, deceased, and the other for a gift tax asserted against E. H. Maytag: (1) A deficiency in estate tax asserted against the estate of Dena B. Maytag, of which Elmer H. Maytag was then the executor, in the amount of $76,568.65, and (2) a deficiency in gift tax for the year 1934 asserted against E. H. Maytag (individually) in the amount of $120,666. After the cases had been decided by the Board of Tax Appeals, E. H. Maytag died and the alternate executor of the estate of Dena B. Maytag and the executors of E. H. Maytag were respectively substituted as respondents on review in the two cases in this Court.

After the disposition of other issues by waiver or concession, the cases as submitted to the Board involved only two questions: (1) What was the fair market value on January 18, 1934, the date of death of Dena B. Maytag, of the 133,859 shares of common stock of the Maytag Company which were a part of her estate, and (2) what was the fair market value on December 15, 1934, of the 400,-000 shares of the same stock which were on that date transferred (by way of gift) by E. H. Maytag in four trusts of 100,-000 shares each?

From a stipulation of facts entered into between the parties and exhibits attached thereto, and from testimony and exhibits adduced in evidence before the Board, the Board made detailed findings of fact in the two cases. Owing to their rather voluminous character, and because of the nature of the arguments of the Commissioner in the present reviews, it is regarded as not necessary to set out in full in the present statement the findings made by the Board.

Dena B. Maytag died testate on January 18, 1934, and included in her estate on the date of her death were 133,859 shares of the common stock of the Maytag Company. E. H. Maytag (Elmer H. Maytag), on December 15, 1934, gave (by way of gift) and transferred in trust 400,000 shares of common stock of the Maytag Company, under four separate trusts of 100,000 shares each, for the benefit of his four children, respectively.

The Maytag Company, whose manufacturing plant and principal office are located in Newton, Iowa, is a Delaware corporation organized in 1925, as successor of a Maine corporation of the same name which had been in the manufacturing business since 1893. It acquired the assets and assumed the liabilities of its predecessor in exchange for 1,350,000 shares of its no par value common capital stock. At the same time 250,000 additional shares of the same common stock were publicly sold by the company to a firm of underwriters at $15 per share, and were sold by the underwriters to the public at $20 per share. After this sale, the total outstanding capital stock of the company consisted of 1,600,000 shares of common stock.

In a recapitalization in 1928, each owner of 100 shares of common stock received, in addition to 100 shares of no par common stock, 5⅝ shares of new $6 cumulative no par first preferred stock and 20 shares of $3 cumulative no par preference stock. In addition, the corporation issued 10,000 shares of the new first preferred stock for public sale. The outstanding capital stock of the corporation then consisted of 100,000 shares of the $6 first preferred stock, 320,000 shares of the $3 preference stock, and 1,600,000 shares of no par common stock.

The tangible net worth of the company as reflected by its books on December 31, 1927, was $10,753,887, which was insufficient to provide for the requirements of the 100,000 shares of first preferred stock in voluntary liquidation ($11,000,000).

Neither the $3 preference nor the common stock had any tangible asset value when so issued. The issuance of the $3 preference stock, however, created a prior claim to any assets of the company in voluntary liquidation ahead of the common stock equivalent to 90 percent of such assets but not to exceed $55 a share, or $17,600,000, before any distribution could be made to the common stock.

In May 1928, 84,500 shares of the first preferred stock, 74,500 shares of which were supplied by stockholders of the Maytag Company, were sold through underwriters to the public at $101 per share and accrued dividends. At the same time the stockholders sold 265,000 shares of the $3 preference stock through underwriters to the public at $50 per share, plus dividends.

Prior to January 18, 1934, the company had retired 40,737 shares of the first preferred stock and 34,512 shares of the $3 preference stock. Most of this stock was retired by purchase in the open market at prices below call price. The increased book value of the common stock in 1930, 1931, and 1932 is due to the credits to the common stock account each year of the amount of discount at which such preferred stock was purchased.

The amounts of the stocks outstanding on January 18 and on December 15, 1934, may be shown by the following tables:

January 18, 1934—
59,263 shares of $6 first preferred stock.
285,488[1] shares of $3 preference stock.
1,617,922½ shares of common stock.

December 15, 1934—
59,263 shares of $6 first preferred stock.
285,483 shares of $3 preference stock.
1,617,922½ shares of common stock.

All classes of the stock were of no par value. The two preferred classes were nonvoting stocks except in case of default of four quarterly dividends, in which event they became entitled, voting together as a class, to elect a majority of the board of directors. The $6 first preferred stock (callable at $110 per share) is entitled to cumulative quarterly dividends of $1.50 before the other two classes of stock and is entitled to preference over the other two classes upon liquidation, to the extent of $100 per share (plus accrued dividends) in involuntary liquidation and $110 per share (plus accrued dividends) in voluntary liquidation, and contains a sinking fund requirement to retire 2,000 shares per year. The $3 preference stock (callable at $55 per share) is entitled to cumulative quarterly dividends of 75 cents before any dividends may be paid on the common stock, and upon liquidation is entitled, after redemption of the first preferred stock, to preference as to 90 percent of the remaining assets, not to exceed $50 per share (plus accrued dividends) in the case of involuntary liquidation and $55 per share (plus accrued dividends) in the case of voluntary liquidation. This stock on original issue carried a warrant entitling the holder of each share to purchase 1½ shares of common stock at $20 per share on or before May 1, 1938.

The record of the dividends paid on the three classes of stock through the years to 1936, inclusive, is shown in detail in tables set out in the Board's findings. Briefly summarized, the two preferred classes ($6 first preferred and $3 preference) paid dividends regularly until 1932, when they fell in arrears. The first preferred paid up the arrears on May 1, 1934, and thereafter regularly paid the dividends accruing. The $3 preference began paying up arrears in 1936. After paying dividends of 50 cents in 1925, $2 in 1926, $3 in 1927, $2.375 in 1928, $2 in 1929, and $1 in 1930, the common stock did not pay any dividends until 1936, when it paid 50 cents.

The book values of the common stock, as reflected by the amounts available therefor in voluntary liquidation and in involuntary liquidation, as of the end of 1933 and 1934, computed from the consolidated balance sheets of the company on those dates, and upon the basis of the amounts required for the two classes of preferred stock, appear in detail in tables set out in the Board's findings. It is there shown that as of the end of 1933, the book value of the common, so computed, was $0.025 per share upon voluntary liquidation and $0.06 upon involuntary liquidation, while at the end of 1934, it was $0.085 on voluntary and $0.12 on involuntary liquidation.

[1] In the findings this figure is given as 225,488, but it was stipulated as 285,488.

125 F.2d—4½

The history of the Maytag business, started in 1893 for the manufacture of other products, its entry into the washing-machine field in 1911, its acquisition of patent rights, its development of a new type of washing machine in 1922, after which it devoted itself primarily to washing machines, its rise to leadership in the industry, the development of changes and competition, the Maytag Company's relative position in the industry, are reviewed at length in the Board's findings, together with an analysis of the company's production facilities and marketing methods, and a detailed record of its sales, operating profit, net income, unit profit, etc., for the years 1925 to 1936, inclusive. It is unnecessary to the consideration of the Commissioner's present appeals to set out these matters at length. It might be observed, in passing, that throughout the years 1925–1936, the company enjoyed a net income in each year, including the period of the depression, although the income dropped to about $100,000 in 1932 from a high level of $6,800,000 in 1929, but the income went up again to $1,-200,000 in 1933, and $1,900,000 in 1934 (in round figures).[2]

All three classes of stock of the Maytag Company were listed on the New York Stock Exchange. On January 17, 1934, 1,375,602 shares of the common, which were equivalent to 85% of the total of 1,617,922½ shares of common then outstanding, were owned of record by F. L. Maytag (founder of the business, husband of Dena B. Maytag and father of E. H. Maytag) and members of his immediate family. Only the remaining 242,320½ shares of common were in the hands of the public and thus the block of 133,859 shares of common to be valued as of January 18, 1934, was more than 50% of the then floating supply. On the other valuation date, December 15, 1934, the family holdings of common stock amounted to 1,363,627 shares, or 84% of the total outstanding.

The number of shares of the common stock of the Maytag Company bought and sold on the New York Stock Exchange, as reported by such exchange, and the monthly high and low prices of the shares

bought and sold, for the years 1933, 1934, and 1935, were as follows:

| | Sales | High | Low |
|---|---|---|---|
| **1933** | | | |
| January | 300 | 2⅞ | 2 |
| February | 400 | 2 | 1¾ |
| March | ..... | ... | ... |
| April | 1,200 | 2⅜ | 1⅛ |
| May | 2,300 | 4½ | 2⅜ |
| June | 2,200 | 5⅞ | 4¼ |
| July | 43,100 | 8½ | 4 |
| August | 20,500 | 7½ | 5¼ |
| September | 7,100 | 7 | 4½ |
| October | 6,200 | 5⅜ | 3¼ |
| November | 2,000 | 4½ | 3½ |
| December | 2,700 | 4¼ | 3¾ |
| Total | 88,000 | | |
| **1934** | | | |
| January | 11,500 | 6¼ | 4⅜ |
| February | 27,600 | 8¾ | 5½ |
| March | 13,100 | 8¾ | 7⅛ |
| April | 7,900 | 8¾ | 7 |
| May | 2,300 | 7⅞ | 6⅜ |
| June | 1,600 | 6½ | 5⅛ |
| July | 4,400 | 6⅛ | 4⅛ |
| August | 2,600 | 5⅛ | 4⅝ |
| September | 1,400 | 5¼ | 4½ |
| October | 1,900 | 5 | 4⅜ |
| November | 10,900 | 5¾ | 4½ |
| December | 21,400 | 6¼ | 4⅛ |
| Total | 106,600 | | |
| **1935** | | | |
| January | 12,000 | 6⅝ | 5½ |
| February | 6,800 | 7 | 5⅝ |
| March | 8,200 | 7⅛ | 6⅛ |
| April | 7,100 | 7 | 6⅜ |
| May | 18,400 | 8⅞ | 6⅝ |
| June | 4,700 | 8½ | 7¾ |
| July | 23,300 | 12⅛ | 7¼ |
| August | 29,200 | 14¾ | 11½ |
| September | 12,200 | 14¾ | 11⅞ |
| October | 22,300 | 15⅜ | 12⅞ |
| November | 39,200 | 20 | 15 |
| December | 10,900 | 17½ | 15½ |
| Total | 194,300 | | |

The sales of the common stock on the New York Stock Exchange by days during January and December, 1934, and the bid and asked prices at the close of each day were as follows:

[2] While, as appears in the table included in the Board's findings, the net income for 1932, as well as for 1931 and 1933, was insufficient to meet the dividends currently accruing on the two classes of preferred stock, yet the company always had an earned surplus throughout the years 1925–1936, after all adjustments and reserves and after writing off of good will and patents.

| 1934 | Sales | High | Low | Close | Bid | Asked |
|---|---|---|---|---|---|---|
| January | | | | | | |
| 1, New Year's Day | ..... | ... | ... | ... | ... | ... |
| 2 | 100 | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{1}{2}$ |
| 3 | 300 | $4\frac{5}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{4}$ |
| 4 | ..... | ... | ... | ... | $4\frac{3}{8}$ | $4\frac{5}{8}$ |
| 5 | 100 | $4\frac{1}{2}$ | $4\frac{1}{2}$ | $4\frac{1}{2}$ | $4\frac{1}{2}$ | $4\frac{3}{4}$ |
| 6 | 100 | $4\frac{1}{2}$ | $4\frac{1}{2}$ | $4\frac{1}{2}$ | $4\frac{3}{8}$ | $4\frac{3}{4}$ |
| 7, Sunday | ..... | ... | ... | ... | ... | ... |
| 8 | 100 | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{1}{2}$ |
| 9 | ..... | ... | ... | ... | $4\frac{3}{8}$ | $4\frac{1}{2}$ |
| 10 | 300 | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{3}{8}$ | $4\frac{1}{4}$ | $4\frac{1}{2}$ |
| 11 | 300 | $4\frac{1}{2}$ | $4\frac{1}{2}$ | $4\frac{1}{2}$ | $4\frac{3}{8}$ | $4\frac{3}{4}$ |
| 12 | ..... | ... | ... | ... | ... | ... |
| 13 | ..... | ... | ... | ... | ... | ... |
| 14, Sunday | ..... | ... | ... | ... | ... | ... |
| 15 | 100 | $4\frac{3}{4}$ | $4\frac{3}{4}$ | $4\frac{3}{4}$ | $4\frac{1}{2}$ | $4\frac{3}{4}$ |
| 16 | 200 | $4\frac{3}{4}$ | $4\frac{3}{4}$ | $4\frac{3}{4}$ | $4\frac{5}{8}$ | $4\frac{7}{8}$ |
| 17 | 100 | $4\frac{7}{8}$ | $4\frac{7}{8}$ | $4\frac{7}{8}$ | $4\frac{5}{8}$ | $4\frac{3}{4}$ |
| 18 | ..... | ... | ... | ... | $4\frac{5}{8}$ | $4\frac{7}{8}$ |
| 19 | 500 | 5 | $4\frac{5}{8}$ | 5 | $4\frac{3}{4}$ | 5 |
| 20 | 300 | 5 | 5 | 5 | 5 | $5\frac{1}{8}$ |
| 21, Sunday | ..... | ... | ... | ... | ... | ... |
| 22 | 900 | $5\frac{1}{4}$ | 5 | $5\frac{1}{4}$ | 5 | $5\frac{3}{8}$ |
| 23 | 2,100 | $5\frac{5}{8}$ | $5\frac{1}{4}$ | $5\frac{1}{2}$ | $5\frac{1}{2}$ | $5\frac{5}{8}$ |
| 24 | 200 | $5\frac{3}{4}$ | $5\frac{1}{2}$ | $5\frac{3}{4}$ | $5\frac{1}{2}$ | $5\frac{3}{4}$ |
| 25 | 900 | $5\frac{3}{4}$ | $5\frac{1}{8}$ | $5\frac{1}{8}$ | $5\frac{1}{4}$ | $5\frac{3}{8}$ |
| 26 | 1,600 | $5\frac{5}{8}$ | $5\frac{3}{8}$ | $5\frac{1}{2}$ | $5\frac{3}{8}$ | $5\frac{5}{8}$ |
| 27 | ..... | ... | ... | ... | $5\frac{1}{2}$ | $5\frac{5}{8}$ |
| 28, Sunday | ..... | ... | ... | ... | ... | ... |
| 29 | 300 | $5\frac{5}{8}$ | $5\frac{5}{8}$ | $5\frac{5}{8}$ | $5\frac{1}{2}$ | $5\frac{3}{4}$ |
| 30 | 1,500 | $6\frac{1}{4}$ | $5\frac{3}{4}$ | 6 | 6 | $6\frac{1}{4}$ |
| 31 | 1,500 | $6\frac{1}{4}$ | $5\frac{7}{8}$ | $5\frac{7}{8}$ | $5\frac{5}{8}$ | $5\frac{3}{4}$ |
| December | | | | | | |
| 1 | 200 | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{1}{4}$ | $5\frac{1}{8}$ | $5\frac{1}{2}$ |
| 2, Sunday | ..... | ... | ... | ... | ... | ... |
| 3 | ..... | ... | ... | ... | $5\frac{1}{4}$ | $5\frac{3}{8}$ |
| 4 | 400 | $5\frac{1}{4}$ | $5\frac{1}{4}$ | $5\frac{1}{4}$ | $5\frac{1}{8}$ | $5\frac{3}{8}$ |
| 5 | 1,000 | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{3}{8}$ |
| 6 | 300 | $5\frac{1}{2}$ | $5\frac{3}{8}$ | $5\frac{3}{8}$ | $5\frac{3}{8}$ | $5\frac{1}{2}$ |
| 7 | 100 | $5\frac{3}{8}$ | $5\frac{3}{8}$ | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{1}{2}$ |
| 8 | 100 | $5\frac{1}{4}$ | $5\frac{1}{4}$ | $5\frac{1}{4}$ | $5\frac{3}{8}$ | $5\frac{1}{2}$ |
| 9, Sunday | ..... | ... | ... | ... | ... | ... |
| 10 | 100 | $5\frac{1}{2}$ | $5\frac{1}{2}$ | $5\frac{1}{2}$ | $5\frac{1}{4}$ | $5\frac{1}{2}$ |
| 11 | 2,700 | $5\frac{1}{2}$ | $5\frac{3}{8}$ | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{3}{8}$ |
| 12 | 600 | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{1}{2}$ |
| 13 | 400 | $5\frac{1}{4}$ | $5\frac{1}{4}$ | $5\frac{1}{4}$ | 5 | $5\frac{1}{4}$ |
| 14 | 1,100 | $5\frac{1}{4}$ | $5\frac{1}{8}$ | $5\frac{1}{8}$ | 5 | $5\frac{1}{8}$ |
| 15 | 3,100 | 5 | $4\frac{1}{8}$ | $4\frac{1}{8}$ | $4\frac{3}{8}$ | $4\frac{5}{8}$ |
| 16, Sunday | ..... | ... | ... | ... | ... | ... |
| 17 | 2,400 | $4\frac{5}{8}$ | $4\frac{3}{8}$ | $4\frac{1}{2}$ | $4\frac{3}{8}$ | $4\frac{1}{2}$ |
| 18 | 1,400 | $4\frac{7}{8}$ | $4\frac{5}{8}$ | $4\frac{7}{8}$ | $4\frac{3}{4}$ | $4\frac{7}{8}$ |
| 19 | 200 | $4\frac{3}{4}$ | $4\frac{3}{4}$ | $4\frac{3}{4}$ | $4\frac{3}{4}$ | $4\frac{7}{8}$ |
| 20 | 100 | $4\frac{7}{8}$ | $4\frac{7}{8}$ | $4\frac{7}{8}$ | $4\frac{3}{4}$ | $4\frac{7}{8}$ |
| 21 | 1,100 | $5\frac{3}{8}$ | 5 | $5\frac{3}{8}$ | $5\frac{1}{8}$ | $5\frac{1}{2}$ |
| 22 | 900 | $5\frac{5}{8}$ | $5\frac{1}{2}$ | $5\frac{5}{8}$ | $5\frac{3}{8}$ | $5\frac{1}{2}$ |
| 23, Sunday | ..... | ... | ... | ... | ... | ... |
| 24 | 300 | $5\frac{5}{8}$ | $5\frac{1}{2}$ | $5\frac{5}{8}$ | $5\frac{1}{4}$ | $5\frac{1}{2}$ |
| 25, Christmas | ..... | ... | ... | ... | ... | ... |
| 26 | 400 | $5\frac{1}{2}$ | $5\frac{1}{4}$ | $5\frac{3}{8}$ | $5\frac{1}{4}$ | $5\frac{1}{2}$ |

| 1934 December | Sales | High | Low | Close | Bid | Asked |
|---|---|---|---|---|---|---|
| 27 | 500 | 5⅝ | 5¼ | 5⅝ | 5½ | 5⅝ |
| 28 | 2,100 | 5¾ | 5½ | 5¾ | 5¾ | 5⅞ |
| 29 | 1,000 | 6⅛ | 6 | 6⅛ | 6 | 6⅛ |
| 30, Sunday | ..... | ... | ... | ... | ... | ... |
| 31 | 1,000 | 6¼ | 6 | 6¼ | 6⅛ | 6¼ |

In 1934, from November 13th to the end of the year, E. H. Maytag disposed of 17,800 shares of his common stock, through the comptroller of the company, George M. Umbreit. He transferred them to the comptroller with instructions to sell them before the end of the year in an orderly manner and without demoralizing the market prices obtainable. Maytag resorted to this method of disposal of the stock to avoid possible unfavorable effect upon Maytag stock in general if it became known that he, the president of the company, was selling a substantial number of shares. The stock was sold by the comptroller in his own personal account with a Chicago brokerage firm, in sales as detailed in the Board's findings, between the dates of November 13th and December 24th, both inclusive, 3,000 shares being disposed of in various sales on Saturday, December 15th, at prices ranging from 5 to 4⅛. In his federal income tax return for 1934, E. H. Maytag reported a capital gain of $82,853.31 from the sale of those 17,800 shares.

In the estate tax return which was filed for the estate of Dena B. Maytag, there was included in the gross estate therein reported 133,859 shares of the common stock of the Maytag Company at a value of $2.50 a share. In the gift tax return of E. H. Maytag for the year 1934, the value of the 400,000 shares of Maytag common stock transferred to the four trusts during that year was stated to be $2.50 a share.

In his respective audits of the estate tax return of the estate of Dena B. Maytag and of the gift tax return of E. H. Maytag for 1934, the Commissioner of Internal Revenue determined that the 133,859 shares had a value of $4.75 a share on January 19, 1934, and that the 400,000 shares had a value of $4.5625 a share as of December 15, 1934. As the Board observed in its opinion, the January 18, 1934, value of $4.75 per share determined by the Commissioner was the mean between the bid price of 4⅝ and the asked price of 4⅞ on the New York Stock Exchange, no sales having been recorded on that day; the December 15, 1934, value of $4.5625 a share determined by the Commissioner was the mean between the high of 5 and the low of 4⅛ of sales recorded on that day on the New York Stock Exchange.

On their respective appeals to the Board of Tax Appeals, it was contended on behalf of the taxpayers, as further observed by the Board in its opinion, that the value on January 18th was between $1.50 and $2 a share and that the value on December 15th was not in excess of $2.50 a share. It was contended by the taxpayers that the valuations determined by the Commissioner were erroneous for the alleged reason that he had failed to take into consideration such factors as intrinsic, liquidating, and earning values and in particular the large quantity of stock involved compared with the small volume traded in on the New York Stock Exchange, and the difficulty of disposing of any block of the size here involved within a reasonable period at a price approximating market quotations.

In arriving at its conclusion as to value, the Board further pointed out in its opinion that the parties agreed that the term "value" used under both the provisions of the Revenue Acts under which the two valuations were to be made (Section 302(a) of the 1926 Act, 26 U.S.C.A. Int.Rev.Code, § 811(a), and Section 506 of the 1932 Act, 26 U.S.C.A. Int.Rev. Code § 1005) meant "fair market value," but that the parties differed in the method to be applied in determining market value, with the Commissioner contending (as contrasted to the contentions of the taxpayers already referred to) that the correct concept of "value" or "fair market value" was "the price at which the property in question would change hands, assuming a willing seller and a willing buyer, i. e., assuming an increase in demand equal to the supply or the quantity of the property in question."

After indicating its view that the effect of placing a large block of a security on the market at one time was a factor of great importance, the Board in its

opinion then proceeded to arrive at its conclusion of value. Entering upon its consideration of the evidence, the Board considered at the outset the testimony of the taxpayers' three expert witnesses (Everett, Quinn, and Murray), the first two of whom were partners of a firm of investment bankers, brokers, and exchange members, while the third was an officer of a firm of private bankers, underwriters, distributors of securities, etc. The Board observed that the consensus of opinion was that in view of the narrowness and thinness of the market, an attempt to sell on the New York Stock Exchange a block of 133,859 shares on January 18th or 400,000 shares on December 15th, or within a reasonable time thereafter, would have depressed the market price to a nominal figure; that they thought that the stock could be sold, if at all, to some individual willing to take a gamble, or to some underwriter or dealer in securities, for resale purposes, and that to interest such purchaser or underwriter it would be necessary to sell the stock at prices below the market quotations; that in arriving at his own respective opinion of value each considered the various factors which he believed would be considered by anyone willing to purchase the blocks of stock in question, such as intrinsic value, book value, earnings, outstanding preferred stock and dividends payable thereon, and other factors. The Board then declared that the fair market value of the 133,859 shares on January 18th had been placed at $2 per share by the first two witnesses and at $1.50 to $2 by the third witness; and that the fair market value of the 400,000 shares on December 15th had been placed at $2.40 to $2.50 by the first witness, $3 by the second witness, and $2.50 by the third. The Board then further observed that all of them were of the opinion that the fair market value of the stock was higher in December than in January of 1934, principally because of the improved conditions of the company, as shown by reports of its nine months' earnings for that year, and because of improved conditions generally in the security market.

After commenting upon the other evidence in the case, including the testimony of the Commissioner's witnesses, the records of earnings, intrinsic value, the company's business, etc., the Board observed, just before reaching its conclusion as to the values, that upon the evidence it doubted "very much that the numbers of shares of stock here involved" could have been sold within a reasonable time after January 18th and December 15th, respectively, without affecting the prevailing market prices. The Board then stated its conclusion to the effect that upon all the evidence, it was its opinion that the 133,-859 shares of Maytag common stock had a fair market value of $3.10 a share on January 18th and that the 400,000 shares had a fair market value of $3.80 a share on December 15, 1934. Those same conclusions as to value, namely, $3.10 a share and $3.80 a share, respectively, were also separately stated by the Board in its findings of fact.

Pursuant to that opinion (and after giving effect to certain other items and adjustments not here material), the Board entered its decisions, reducing the deficiency in estate tax from $76,568.65, as determined by the Commissioner, to $17,704.82, and reducing the gift tax deficiency from $120,666, as determined by the Commissioner, to $71,783.

## Opinion

As shown by the foregoing statement, the only question in controversy before the Board of Tax Appeals in No. 12,025 was the question, "What was the value of the block of 133,859 shares of the common stock of The Maytag Company on January 18, 1934, for estate tax purposes?" and in No. 12,026, "What was the value of the block of 400,000 shares of the same stock on December 15, 1934, for gift tax purposes?" The Board declined to fix the values in accordance with the applicable Treasury Regulations (80, 1934 Ed. Art. 13(1) (3) and 79, 1936 Ed. Art. 19(1) (3), promulgated under the Revenue Acts of 1926 and 1932 as amended, requiring valuation according to the sale and bid and asked prices quoted on the board of the New York Stock Exchange where the stock was listed and regularly traded in. The contention of the Commissioner on this review is that the Board applied an erroneous method resulting in erroneous conclusion that the value of the two blocks of stock was less than the prices at which the stock was regularly bought and sold on the open market of the New York Stock Exchange. There was no evidence that the market was affected by fraud or manipulation, or that the quoted transactions were fictitious, or that there were only occasional sales of

the stock, or that the trading in it was at remote dates or under peculiar or suspicious circumstances. Admittedly, the trading was continuous and the amounts of the stock which changed hands in the trades were substantial. But there were no trades on the board involving blocks of the stock in any way comparable in size with the blocks of 133,859 shares and 400,000 shares which the Board had to evaluate, the total of the shares traded in over the three year period tabulated amounting to less than half of the 400,-000 share block, and there was expert opinion that market quotations were above the true value of the large blocks of stock to be valued. Although the Board did not expressly declare that it refused to apply the measuring rod of the Regulation because of the great amount of stock it had to evaluate in comparison with the amounts traded in on the market, its findings and opinion demonstrate conclusively that such was the reason and there was no other. ·

■ It is conceded that the question of value is a question of fact and the findings which the Board made upon the issue of value is not reviewable here if the values found are supported by substantial evidence. "But the question of what criterion should be employed for determining the 'value' of the gifts is a question of law." Powers v. Commissioner, 312 U.S. 259, 61 S.Ct. 509, 510, 85 L.Ed. 817. Likewise as to the value of the estate in question. If as a matter of law the Board did not value the property according to the best available criterion, and if the shares of stock should have been valued according to the New York Stock Exchange quotations as contended by the Commissioner, the decisions of the Board ought to be reversed.

In support of his position that the market quotations on the stock made available to the Board constituted "primary" or "best" evidence of the value, and that the production of such evidence rendered the opinion and other evidence considered by the Board inadmissible, the Commissioner has pointed out that the valuation of property for tax purposes ought to conform as nearly as possible to standard business practices (Maass v. Higgins, 312 U.S. 443, loc. cit. 449, 61 S.Ct. 631, 85 L.Ed. 940, 132 A.L.R. 1035) and it is said to be familiar knowledge that the business world of banks, trust companies, insurance companies, trusts, etc., in valuing its security portfolios makes no dis-

counts because of the size of the security holdings (illustrative examples are instanced from the record). He also observes that the method followed by the Board resulting in reduction of the values below the stock market quotations would have the result of frustrating the intent of Congress to impose estate and gift taxes at rates graduated according to the size of the estate or gift. A person making a gift of a large number of shares of a particular stock would be taxed at a lower valuation than the person transferring a small lot of the same stock. Such differentiation, he says, offends against the fundamental principle of uniformity in taxation.

It is also argued that as a matter of reality the changes in ownership of the two blocks of stock involved, occasioned by the death and the transfers in trust, might make no change whatever in the supply of the stock on the stock market. There was no evidence that the blocks of stock to be valued were added or expected to be added to the supply in the market. Without assuming some increase in the supply on the market for which demand would be lacking, it is argued that there could be no reason for evaluators to go outside the market quotations of what was asked and bid and the prices at which the stock actually sold, and that no one's opinion of a stock value could be taken against the market figures. Compared with the stock market yardstick of valuation, any other is said to be speculative and vague and unconvincing.

The courts, including our own, have held in many cases that where the question arises in litigation as to the value of property regularly traded in on an established market, the question merely is as to the price it commanded in the market at the particular time and the reasoning and philosophy of such decisions have been developed in the brief of the Commissioner. He has also called attention to the long period in which the Treasury Regulations referred to have endured. The method prescribed in the Treasury Regulations for determining the value of listed stocks goes as far back as 1919 (R. 37, Art. 15(2) 1919 Ed.). The old provision of the regulations (last sentence (3) Art. 13(1934) Art. 19(1936) to the effect that the size of estate holdings or gifts of securities would not be considered by the Commissioner for gift or estate tax purposes was dropped in 1939 after validi-

ty of the provision had been challenged in the courts.

██ On the other hand, while we are cited to no direct ruling of the Supreme Court or this court upon the precise contentions here presented for the Commissioner, they have been frequently considered by other federal courts and the decisions are unanimously against him. As well as any controverted question of administrative law may be settled without declaration by the Supreme Court, it is established that the size of a block of listed stock may be a factor to be considered in its valuation for gift or estate tax purposes. Where, as in this case, the taxpayer affirmatively shows that a block of listed stock to be valued is very great in comparison with the amounts of the stock which have been traded in on the exchange where it is listed, that the block of stock could not be sold on such market at its quoted prices within a reasonable time by skilled brokers following prudent practices for liquidation and that the true value of the block of stock is in fact different from the price quotations, then the taxpayer is entitled to have all other proper evidence of the value of the block of stock considered together with the market quotations. The arguments for the Commissioner to the contrary have not persuaded us that the rulings of other Circuit Courts of Appeals and District Courts to the stated effect should be departed from. Helvering v. Safe Deposit & Trust Co., 4 Cir., 95 F.2d 806; Bull v. Smith, 2 Cir., 119 F.2d 490; Grant Co. v. Duggan, 2 Cir., 94 F.2d 859; Commissioner v. Shattuck, 7 Cir., 97 F.2d 790; Gamble v. Commissioner, 6 Cir., 101 F.2d 565, certiorari denied 306 U.S. 664, 59 S.Ct. 790, 83 L.Ed. 1061; Doric Apartment Co. v. Commissioner, 6 Cir., 94 F.2d 895; DuPont v. Deputy, D.C., 26 F.Supp. 773; Groff v. Smith, D.C., 34 F.Supp. 319; Hazeltine Corp. v. Commissioner, 3 Cir., 89 F.2d 513; Helvering v. Kimberly, 4 Cir., 97 F.2d 433; Laird v. Commissioner, 3 Cir., 85 F.2d 598; Page v. Howell, 5 Cir., 116 F.2d 158; Richardson v. Helvering, 65 App.D.C. 105, 80 F.2d 548; Rogers v. Helvering, 2 Cir., 107 F.2d 394; Roth v. Wardell, 9 Cir., 77 F.2d 124; Union Nat. Bank of Pittsburgh v. Driscoll, D.C., 32 F.Supp. 661 (not in conflict). We have, however, no criticism of the persistence of the Commissioner in a matter of such importance not finally settled by the Supreme Court.

We conclude that there was substantial evidence before the Board of the values found by it and that the evidence was competent.

No. 12,025 affirmed.

No. 12,026 affirmed.