BRONSON v. COMMISSIONER OF INTERNAL REVENUE.

No. 9, Docket 21266.

United States Court of Appeals Second Circuit.

Argued April 11, 1950.

Decided June 23, 1950.

---

15. 7 C.F.R. (1949 ed.) § 46.2(s).

Mabel Walker Willebrandt, Washington, D. C., for petitioner.

Charles Oliphant, Washington, D. C., Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack, Lee A. Jackson, Melva M. Graney, Special Assistants to the Attorney General, for respondent.

Before L. HAND, Chief Judge, and SWAN and CHASE, Circuit Judges.

CHASE, Circuit Judge.

This is a petition to review a decision of the United States Tax Court, entered September 30, 1948, determining a deficiency in petitioner's income tax for the calendar year 1929 in the amount of $96,790.36. Although a deficiency notice notifying him of the Commissioner's determination of a deficiency for 1929 was not mailed until August 6, 1943, and although I.R.C. § 275, 26 U.S.C.A. § 275, requires assessment of income taxes within two years after a return is filed, under § 276(a) the tax may be assessed at any time in case of "a false or fraudulent return with intent to evade tax or of a failure to file a return * * *." The petitioner filed a return for 1929 but the Commissioner held, and the Tax Court sustained his holding, that petitioner's return was fraudulent with intent to evade tax. Purportedly pursuant to I.R.C. § 293 (b) 26 U.S.C.A. § 293(b), requiring that a 50% penalty "shall be * * * paid" if any part of a deficiency is due "to fraud with intent to evade tax," a penalty in the amount of $50,129.80 was imposed by the Tax Court.

The principal issue is whether there was sufficient evidence to support the Tax Court's finding that petitioner fraudulently failed to report as income for the year 1929 a part (3.50/4.6409) of the value of certain shares of stock in Bagdad Copper Corporation delivered to him pursuant to a contract with that company made that year. A proper determination of this issue requires a consideration of the events leading

up to, as well as those occurring after, this transaction.

Petitioner's business for some years before 1929 was, in his words, "mining and oil." One of his interests in 1927 was Bagdad Copper Corporation, which was organized in that year to take over the properties of Arizona Bagdad Company. The assets of Arizona were acquired by Bagdad in exchange for all of its authorized stock, four million shares of $1 par value. 2,800,000 of these shares, however, were turned back to Bagdad by the sellers of Arizona, and thus became treasury stock. Of the 1,200,000 shares remaining outstanding, the transfer books of Bagdad show that petitioner held in his name over 80,000 from and after May 6, 1927 at least until October 27, 1930, at which time the various certificates held by him were cancelled and consolidated.

The newly formed corporation was in 1927 in the development stage only; it owned mining claims on about 2,200 acres of land in the State of Arizona, some buildings and some equipment, but it was not actually engaged in mining operations. Previous churn drilling, tunnelling and surface workings had indicated that a certain tract of 60 acres as to which Bagdad held claims contained an estimated 51,000,000 tons of copper-bearing ore. Further development and exploration work on the adjoining 100 acres of land, it was hoped, would double the estimated amount of ore tonnage. For this purpose, it was thought, $600,000 would be needed. It was also thought that if this work proved successful some $15,000,000 would be necessary to build and equip the plant that would be required for actual mining operations.

In order to raise the $600,000 needed for the development work, Bagdad entered into a contract with petitioner on March 7, 1927. Among other things this contract provided that under what was called "Option A" petitioner or his assigns should have the right to purchase all or any part of 600,000 shares of Bagdad stock at $1 per share, under certain conditions not now relevant. Under what was called "Option B" it was provided that if he or his assigns completed the purchase of the 600,000 shares according to the provisions of Option A, under certain other presently irrelevant conditions, he or his assigns should have the right to purchase at 90% of face value $15,000,000 face value of first mortgage coupon gold bonds, to be issued by Bagdad as required to finance the cost of building the necessary plant. Upon the completion of the purchase of the bonds, petitioner, or his assigns were to have the right to receive the 2,200,000 remaining shares of treasury stock "as a bonus or consideration." Bagdad further agreed not to increase or diminish its authorized capital stock of $4,000,000 for any purpose, and to deposit in escrow two certificates, one for the 600,000 shares covered by Option A, and the other for the 2,200,000 shares covered by Option B. By virtue of this 1927 contract, then, Bagdad in effect tied up all of its treasury stock, and limited itself, contingent upon receiving a preliminary $600,000 from petitioner, to financing the building of its operating plant by the sale of first mortgage bonds.

Petitioner exercised Option A by retaining 100,000 of the 600,000 Option A shares himself and selling the remaining 500,000 shares under what he called a "syndicate plan." Under this plan, at least as it was originally set forth, the 500,000 shares were to be purchased in one or more units of 5,000 shares each at $7,500 per unit, each unit so purchased to carry with it the right to buy, when and if issued, 1% of the total amount of Option B bonds "at a minimum of" 90% of their value and the right to receive as a bonus therewith 20,000 shares of Option B stock for each 1% of bonds so purchased. The stock transfer books of Bagdad show that 151,000 of the Option A shares had been acquired by petitioner in his name as of April 16, 1929. On July 9, 1929 he sold 5,000 of these shares, and he held the remaining 146,000 at least until the end of that year.

Other than petitioner, only one of the purchasers of Option A stock, Richard F. Grant, testified at the trial. He testified that he did "not know what arrangements Mr. Bronson made in the sale of the stock"; that he, Grant, thought he "put in $30,000 in 1927" but that he could not

say "just how many shares" he received, and that he "paid something more than $1.00 a share"—perhaps $1.25. He said that "There was no document that went along" with his purchase of the shares but that he "understood that there would be something done for the people who were in the original syndicate but I am not sure about that"; and that he "knew that this stuff had been pledged." There is no evidence in the record as to what petitioner paid for the Option A shares he himself received as a result of the 1927 contract, nor is there any evidence as to how many, if any, of such shares he held in the name of nominees. The internal revenue agent, Van Ackere, who examined the Bagdad stock transfer books testified, however, that "Bronson used various nominees," though he did not specify whether Bronson so held any Option A stock, and that the tabulation he made of Bronson's holdings, with one exception, did not include the shares standing in nominees' names. That exception was as to one certificate for 80,000 shares; the tabulation shows only one certificate for 80,000 shares and lists that as from the original issue of 1,200,000 shares, and not from the Option A stock. Petitioner's 1929 return included as income $212,104 profit from the sale of 134,186 shares of Bagdad stock. Yet the Bagdad transfer books show that only 22,691 shares registered in Bronson's name were transferred out in that year, leaving 111,495 shares apparently held in the name of nominees and sold in 1929. This tends to show that petitioner used nominees extensively but still does not show that any of the Option A shares were held by petitioner in the name of a nominee. On the other hand, there is no evidence that none was so held.

In any event, it does appear that Bagdad did receive the $600,000 it had hoped to obtain as a result of the 1927 contract with petitioner. Thus, Bagdad became committed to do any further financing by the issue of bonds up to the amount of $15,000,000 as to which Option B was applicable, and its remaining authorized stock, 2,200,000 shares, became frozen. The $600,000, however, proved inadequate in 1928 to carry out the development program. It was estimated that another $700,000 would be necessary to complete this program and it was thought that this should be done through the sale of some of the 2,200,000 shares then frozen under Option B of the 1927 contract. Although petitioner was the president and one of the directors of Bagdad, he was, according to Grant, who became a vice-president in 1928, "dealing with us at arm's length." Petitioner, Grant testified, "wanted that made perfectly plain that so far as the deal was concerned it was up to us to see that we got the right kind of deal so we did work out a situation under which he insisted on knowing he had 500,000 shares available to him for purchase for $700,000 and it was up to him to decide what kind of package he was going to make out of it, or what the basis would be."

The contract made between Bagdad and petitioner, on September 5, 1929, provided that, conditioned upon petitioner's securing and delivering to Bagdad within thirty days a firm underwriting by responsible persons to take up and pay for 200,000 shares of Bagdad stock at $3.50 per share within ninety days, (1) Bagdad would deliver to petitioner 300,000 other shares and thereupon the 1927 agreement would be cancelled and of no further effect or validity; (2) Bagdad would deposit in escrow a certificate for 200,000 shares to be released upon the payment of $700,000 by petitioner to the escrow agent; (3) petitioner would have an option under certain other presently irrelevant conditions to purchase the remaining 1,700,000 Bagdad shares at $5 per share; and (4) Bagdad would deposit in escrow another certificate of 1,700,000 shares, to be released upon the exercise by petitioner of this last option. In addition petitioner agreed, in consideration of this contract, to protect, indemnify and save harmless Bagdad and the members of its board of directors from any loss, damage, or expense which might be incurred by them in connection with the cancellation of the 1927 agreement and the release or sale or other disposition of the stock deposited in escrow under that agreement.

Petitioner obtained subscriptions for the 200,000 shares at $3.50 per share from seventeen persons, including himself. Some of the subscribers to the 200,000 shares under the 1929 contract had also been unit holders under the 1927 plan; and those who were not received no part of the other 300,000 shares committed to petitioner under the 1929 contract. The seventeen subscribers paid in the $700,000 called for, petitioner paying $3,500.

In 1929, petitioner received, directly, 111,000 of the other shares committed to him but did not report any part of the value of the shares so received as income in that year. Rather, he deducted on his return $40,300 as "paid for services" with the explanation, made subsequently, as will appear below, that this was for at least 40,000 shares of Bagdad stock at a value of $1 per share, transferred to nine persons who had given him legal advice regarding the 1927 contract, aided him in the sale of stock received under that contract, and assisted in the development of a certain metallurgical process. The 40,000 shares so transferred were out of the 300,000 additional shares received under the 1929 contract. Subsequently, however, it appeared that 42,300 shares had been given to some 23 persons for their "services" and the Tax Court considered that 41,000 of them had been received out of the 1929 contract shares.

It is petitioner's failure to report as 1929 income the fair market value of the 111,000 shares received directly by him in 1929 as above, plus that of the 41,000 shares received by the nine persons for their "services," less the value of his rights under the 1927 contract, that the Tax Court held was fraudulent. The Tax Court noted that petitioner held in his own name as of September 5, 1929, 146,000 or about 25% of the 600,000 Option A shares under the 1927 contract; thought that these gave him, under Option B, the right to purchase the same proportion of the to-be-issued bonds and the right thereupon to receive a like proportion of the then remaining 2,200,000 shares of treasury stock; found that he and the others mentioned received 152,000 shares under the 1929 contract in exchange for his surrender of those rights and his performance of services in procuring the $700,000 of additional capital then needed. It held, therefore, that the part of the fair market value of the 152,000 shares thus received directly and indirectly by Bronson that was attributable to his performance of services was income to him in 1929. It held, apparently on the basis of the "National Stock Summary" for April 10, 1929 to October 10, 1929, showing bids for 100 to 500 share lots of Bagdad stock varying from $2\frac{7}{8}$ to $4\frac{1}{2}$ and offerings of 15 to 500 share lots varying from $3\frac{1}{8}$ to 5, and on the basis of the underwriting petitioner was able to obtain, that the fair market value of the 152,000 shares thus received by petitioner was $532,000 ($3.50 per share). It found that $365,428.60 of this was attributable to Bronson's performance of services.

Its allocation was based on the premise that persons other than Bronson held in September, 1929 454,000 of the 600,000 1927 shares for which they received 148,000 out of 300,000 1929 shares. Since the stock then had, according to the Tax Court, a fair market value of $3.50 per share and the value of the 148,000 shares was therefore $518,000, the consideration received for the surrender of the rights under the 1927 contract was, then, equivalent to $1.1409 for each share of the 454,000 1927 shares held ($518,000 divided by 454,000, equals $1.1409). Thus, the amount received by petitioner under the 1929 contract allocated to the surrender of his rights stemming from the 1927 contract was $166,-571.40. ($1.1409 X 146,000). The Tax Court considered that "It is reasonable to assume that the consideration received by the petitioner for the surrender of his contract rights was the same as that received by the other owners. * * *" Inasmuch, however, as the Commissioner sought only the deficiency resulting from the increase of income realized from the receipt of the 111,000 shares directly received, the Tax Court held that $266,859.04 (111/152 of 365,428.60) was the amount of the income received for services attributable to the 111,000 shares. The Tax Court went on to hold that petitioner "must have known

that at \$3.50 per share, the fair market value of the 111,000 shares was \$338,500, a value far in excess of any basis which might be attributed to the contract rights which he surrendered. He also must have known that the value of the consideration received for his services, when considered separate and apart from the value received for his rights, was great and that at least that value constituted income which should have been reported as such in his return."

Petitioner, however, contends now that he held in September 1949, besides 146,000 shares in his own name, some 207,333⅓ shares in the names of others, out of the 600,000 Option A shares issued under the 1927 contract, so that he received stock in 1929 in the same proportion to his holdings of Option A "syndicated" shares (253,-333⅓) as did other holders, viz., 3,000 shares received per 5,000 Option A "syndicated" shares held. The findings do not resolve this contention one way or the other and, as will be seen, the finding of fraud is based on inferences which we think are unsupportable if the petitioner's above contention is correct.

It is also to be noted that petitioner testified that he consulted three lawyers with respect to the tax incident on his 1929 purchase of stock and they advised him that "there was nothing in any of the contractual relations under either the amendment [the 1929 contract] or the original agreement [the 1927 contract] or any of the steps that led to the financing that was of a taxable nature." One of these lawyers had died by the time of the trial and another did not testify. The one who did testify first said that he advised petitioner that "so far as the Bagdad stock which he purchased under these two contracts of 1927 and 1929 was concerned, there was no taxable income in that transaction but only if he went out and sold any of that, and sold it at a profit, then there was a tax." He then testified "I told him that I didn't think he had any taxable income on the stock that he got." But he did not, to the best of his recollection, see the 1929 contract, and had "nothing" to do with it.

Giving due consideration to the question of shares held in the name of nominees, we think that there was insufficient evidence to support the finding of fraud, an issue as to which the Commissioner had the burden of proof. F. Vitelli & Son v. United States, 250 U.S. 355, 39 S.Ct. 544, 63 L.Ed. 1028; Cohen v. Commissioner, 10 Cir., 176 F.2d 394, 401; Jemison v. Commissioner, 5 Cir., 45 F.2d 4, 5. It is undisputed that, as a result of Bagdad's over-optimistic estimate in 1927 as to the cost of development and exploration work and its 1927 contract with petitioner, it found itself in 1929 facing the situation that it would either have to forego further preliminary work, cancel the 1927 contract and thus free its stock for the purpose of raising the money needed for further development work, or issue bonds for that purpose. As Grant, one of its then vice-presidents, testified, "We were in a situation where we couldn't finance at all. We didn't have any stock to sell and we had to make some other arrangements and that started the negotiations in 1929 with Mr. Bronson. * * * It was the opinion of everybody then that we ought to get away from the issuance of bonds and I felt that I shouldn't have bond [sic] in the development stage because you will lose your property and then in the development stages you shouldn't be burdened with interest charges." Thus, Bagdad had to turn to the sale of stock, but, as has been shown, all its stock was frozen as a result of the 1927 contract, so that the holders of rights under that contract were in an enviable bargaining position. Both petitioner and Bagdad realized this: as Grant testified, "Mr. Bronson was always very meticulous to see to it before he made any commitments of any kind that he knew what he had to deal with," and he, Grant, was "pretty sure of this, that if we could not get a set up there under which we could get rid of those old bonds and the whole stock that was pledged, that the thing [the raising of the \$700,000 needed for further development work] would never be consummated." Legally, of course, this last was an understatement: the company and petitioner could not have abrogated the 1927 contract as respects petitioner's assigns, without their consent. As Grant said, "In

short, Bronson was dealing with us at arm's length." In the strategic position of being president and a director of the company, of having raised capital for it previously, and of owning at least 146,000 of the shares issued under Option A of the 1927 contract with at least the rights thereto attached to by 9⅓% of any bonds to be issued at 90% of their face value, and to receive up to 384,000 [1] shares of bonus stock upon purchase of the bonds, petitioner could, and did, drive a hard bargain. He received under the 1929 contract 500,000 shares, 200,000 to be sold to raise the needed $700,000, and the remaining 300,000 to be disposed of as he saw fit and as was necessary to obtain releases of the claims of the holders of Option A stock issued under the 1927 contract. That this last was recognized by the parties is shown by the agreement of petitioner to save harmless the directors and the Company from any loss, damage or expense incurred by reason of the cancellation of the 1927 agreement. In short, the 1929 transaction would seem to have been one in which petitioner was surrendering his rights under the 1927 contract for 300,000 shares of stock less whatever shares he had to use to obtain the surrender of the rights held by other purchasers of stock under the 1927 contract. It may be that he received proportionately much more stock than other holders. If so, that, it would appear, was due to his bargaining power, and was not compensation to him for his services in obtaining the new capital, and, it should be pointed out, as a substantial investor in Bagdad he was no doubt interested in protecting his prior investment which, without the new capital, would have been imperiled. Moreover, he did receive under the 1929 contract an option to buy 1,700,000 shares of stock at $5 per share, under certain conditions, and this option may well have been considered as in the nature of compensation to him, if he was to receive any.

At least, the view of the 1929 transaction above expressed is one which might reasonably have been taken by petitioner. If this view were honestly held, it cannot be said that his failure to report any part of the value of the 152,000 shares distributed to him as a result of that transaction as income was fraudulent. See Commissioner v. S. A. Woods Mach. Co., 1 Cir., 57 F.2d 635, certiorari denied, 287 U.S. 613, 53 S.Ct. 15, 77 L.Ed. 532; Delone v. Commissioner, 3 Cir., 100 F.2d 507; Jemison v. Commissioner, supra.

The only evidence tending to indicate that petitioner did not honestly entertain this view of the transaction was that in July, 1931 at the time of a hearing on his protest as regards the disallowance of his 1929 deduction of $40,300 for "services rendered" by various persons in connection with the sale of the 1927 stock and certain other now immaterial deductions he did not, the Tax Court found, tell the conferee, Fisher, of the 1929 contract—despite the fact that those persons had been paid in large part, if not entirely, with shares received under that contract. An agent named Chwalow had previously examined petitioner's return, and had recommended the disallowance of the deductions. Petitioner and his accountant both testified that Chwalow attended the conference with Fisher and that both Chwalow and Fisher were then well acquainted with the issuance of the 300,000 shares to petitioner under the 1929 contract, since the principal subject for discussion was whether petitioner was entitled to use $1 per share as the cost to him of the shares transferred to the various persons for services rendered on a "first-in, first-out" basis, or 66⅔¢ per share, arrived at by allocating the $600,000 contract price under the 1927 contract between the 600,000 shares received thereunder and the 300,000 shares received under the 1929 contract. Fisher testified that Chwalow was not present at the hearing; that he, Fisher, could not recall any discussion about 66⅔¢ being the cost of the shares to petitioner; that he had about 220 such hearings in 1931 and relied principally on

1. 200,000 shares of Option B stock were omitted from the "syndicate plan"; each 5,000 Option A shares purchased under that plan entitled the purchaser to buy 1% of the to-be-issued bonds, and thereupon to receive 20,000 shares of Option B stock.

notes he had taken at the hearing to refresh his memory as to what occurred; and that he was not shown the 1929 contract. The Tax Court believed Fisher and found that the petitioner did not disclose the 1929 contract. From that it inferred that he fraudulently concealed his acquisition of the stock involved in this controversy. As support for the finding that petitioner did not then disclose the 1929 contract is found in Fisher's testimony which the Tax Court believed, we accept the finding for only a question of credibility is present as to that. But it by no means follows that the inference would have been drawn that he thereby fraudulently concealed the acquisition of the shares he received under the 1929 contract if the court had viewed his conduct in the light of the actual number of unit rights he owned not only by virtue of Option A shares held in his own name but in the name of nominees and in the light of petitioner's strong bargaining position in connection with the 1929 contract. So viewed, any motive for concealment might have disappeared and non-disclosure of the existence of the 1929 contract been revealed as colorless on the question of fraud.

■ But it is argued, even assuming that petitioner did not fraudulently fail to report as income part of the value of the 152,000 shares he received in 1929, he fraudulently failed to report it as gain. That is, the argument runs, he received $518,000 worth of stock for rights for which he could not have paid more than $1 per share cost of the Option A stock to which Option B rights were attached; there was a gain, therefore, even assuming that he owned 253,333⅓ shares of Option A stock, of $276,666.67. But, accepting the Tax Court's questionable valuation of the 152,000 shares received in 1929 by petitioner at $3.50 per share—questionable because of the principle that the size of a block of stock should be considered in valuing it,[2] a principle which has more force, it would seem, when applied to stock acquired within two months of the stock

market crash of 1929—we nevertheless think there was not sufficient evidence of fraud here. It was a not unreasonable view to take of the law—at least in 1929 and 1930—that the exchange of stock for the release of an option to buy bonds and receive bonus stock therewith was to be treated the same as stock acquired by advancing loans to a corporation, which was not a taxable exchange, Board v. Commissioner, 6 Cir., 51 F.2d 73. Then, the rule that the taxing laws were, in case of doubt, to be construed "most strongly against the government, and in favor of the citizen", Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211, was in vogue. There is no evidence that petitioner's then reasonable, if now erroneous, view of the law was not honestly held, other than Fisher's testimony concerning suppression of the 1929 contract at the 1931 hearing, with which we have dealt above.

■ Finally, the Commissioner argues that petitioner's deduction on the basis of $1 per share for the shares transferred in 1929 to various persons for their services in connection with the sale of Option A stock was fraudulent. This, we think, is grasping at straws. Even though the shares were actually some of those received under the 1929 contract, it was reasonable enough—whether or not erroneous as a matter of present tax law—to treat their cost basis as $1. It should be remembered that petitioner had a prior large block for which he had paid $1, and under the "first-in, first-out" rule, he had a fair claim to this basis regardless of the certificates that were actually transferred.

Reversed and remanded for reconsideration on the question of fraud.

L. HAND, Chief Judge, dissents in separate opinion.

L. HAND, Chief Judge (dissenting).

On the books of the company Bronson was entitled to 384,000 of the Option B shares and the other shareholders to 1,816,000—about five sixths of the whole 2,200,-

---

2. E. g., Commissioner v. Stewart's Estate, 3 Cir., 153 F.2d 17; Helvering v. Maytag, 8 Cir., 125 F.2d 55, certiorari denied 316 U.S. 689, 62 S.Ct. 1280, 86 L. Ed. 1760.

000. Therefore, if we count the option on the bonds as having no value, when Bronson gave 148,000 shares to the other shareholders he ought to have kept less than 30,000 shares for himself; instead of this he kept 152,000, an excess of 122,000 shares, which has been reduced to 111,000. In his "answer to the respondent's answer" his explanation for the omission of any mention of these in his return was that the shares were not income because he had "paid fully for them pursuant to his contract to purchase * * * and that none of said shares were sold in 1929." This his attorney more fully developed upon the argument in the Tax Court, saying that without "tearing a part of the various contract provisions and isolating a provision by itself" it was impossible to "devise out of [sic] this continuing transaction from 1927 to 1929 any free stock he ever got." Bronson did therefore definitely assert that he had never "realized" any gain in 1929 from the 152,000 which he retained for himself. I do not say that that was a totally untenable position, or that it alone constituted that "clear and convincing" evidence which fraud demands; but plainly it depends upon the linkage of the 1929 contract with the 1927 contract, so that the later contract can be treated as a "modification" of the earlier. I do not rest on the language of the 1929 contract that, when it was performed, "the original agreement shall be cancelled and shall be of no further effect or validity"; but I do weigh much more heavily than do my brothers Bronson's suppression in 1931 of the 1929 contract. The Commissioner had challenged his deduction in 1929 of 40,000 shares, which he had defended as a payment of debts due before that year. Those shares apparently came out of the 152,000 shares which he had just received, not out of the 146,000 he had got in 1927 and later. To excuse his silence he says, as I understand it, that it was not material to the deduction what was the source of the shares; and that would be a good excuse, if the shares were still worth only $1. However, 200,000 had just been sold for $3.50 and he did not assert that the debts were more than $40,-000. Bearing that in mind, it seems to me most unlikely that he should have suppressed the 1929 contract for any other than a fraudulent motive; and indeed it must be remembered that his position was that he disclosed it—a statement which, however, the Tax Court did not believe. When fraud is in issue, much depends upon the impression of rectitude and credibility that the party makes upon the tribunal, if he appears in person. That is of course all lost in the record, although in the case at bar it must be remembered that Bronson's credibility was impeached by a previous conviction for fraud in transactions concerning this same company. I cannot of course know how I should have decided the case, had I been the trial court, but I cannot agree that we are justified in holding that the finding was "clearly erroneous" of a judge who saw the taxpayer, and had a chance to measure the truth of his excuse. Incidentally, I cannot find that on the stand he testified that he had supposed that no gain had been "realized" upon the 111,000 shares in 1929.

There remains the suggestion made, so far as I can find, for the first time on appeal that Bronson may have been justified by the fact that some of those who took up the 200,000 shares in 1929 were in fact his "nominees." He did not plead this; he did not suggest it in his testimony. It rests upon Van Ackere's testimony that there were shares so held, though how many he did not say; and upon the fact that in 1929 he paid a capital gains tax upon the sale of more shares than the company's records show that he had transferred in that year. Although this evidence does show that the corporate records were not a complete list of his holdings it is reasonable to insist that he, who alone knew the facts, should have proved how many of those who took up the 200,000 shares were in fact his "nominees." It does not seem to me fair to the Commissioner to assume, as we must in order to exculpate Bronson on this ground, that he had enough undisclosed shares to justify his retention of the 111,000 in question.

I have not tried to compute the correctness of the deficiency, because my views are not to prevail.